306 F.Supp. 588 (1969)
EMERSON ELECTRIC COMPANY, a Missouri Corporation (a common stockholder), Plaintiff,
v.
RELIANCE ELECTRIC COMPANY, an Ohio Corporation, Defendant.
No. 68 C 87(3).
United States District Court E. D. Missouri, E. D.
September 18, 1969.
Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for plaintiff.
*589 Kenneth Teasdale, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
REGAN, District Judge.
In this case, tried to the Court, plaintiff seeks a declaratory judgment concerning its liability, if any, to defendant for profits realized on the sale of certain stock. Defendant has counterclaimed for the amount of the profits. The issue of profits has been postponed pending the resolution of the issue of liability. We have diversity jurisdiction.
For determination is the construction and application of Section 16(b) of the Securities Exchange Act of 1934 (Section 78p(b), 15 U.S.C.) to the peculiar facts of this case. Most of the essential facts have been stipulated. On May 22, 1967, Emerson Electric Company invited tenders of up to 550,000 shares of Dodge Manufacturing Corporation common stock at a price of $63, reserving the right to purchase all shares tendered. As extended, the tender offer expired June 16, 1967. At that time, Emerson elected to purchase all of the tendered shares, a total of 152,282. These shares constituted 13.2% of the outstanding Dodge common stock. Prior to June 16, 1967, Emerson did not own any shares of Dodge common stock.
Shortly before the stock acquisition by Emerson, Dodge and Reliance Electric & Engineering Company (now Reliance Electric Company) had entered into an agreement whereby Dodge was to be merged into Reliance. Emerson sought to prevent the merger, which needed stockholder approval, advocating instead a merger with Emerson. A stockholders' meeting to consider the merger proposal was called for August 22, 1967. A proxy fight ensued, the result of which was victory for Reliance. Shortly thereafter, but prior to the final approval of the merger by the Dodge directors, Emerson sold its Dodge holdings. It first sold 37,000 shares at $68 a share on August 28, 1967 to Goldman, Sachs & Company, investment brokers. Then, on September 11, 1967, it sold the remaining 115,282 shares at $69 to Dodge. Concededly, Emerson realized a substantial short-term profit on these sales even after deducting all of its expenses of purchase and sale.
Section 16(b) provides, inter alia, that any profit realized by the beneficial owner of more than 10% of certain equity securities from the purchase and sale (or sale and purchase) within any period of less than six months shall inure to and be recoverable by the issuer. The statute further provides:
"This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved * * *."
The initial question for determination is whether Emerson was a beneficial owner of more than 10 per cent of Dodge common stock "at the time of the purchase" of such stock. Emerson states the question thusly: "Should the very purchase by which one, who prior thereto owns no securities of an issuer, becomes a 10% owner be counted in determining liability for insider short-swing profits?" It argues that in the context of the Act, the words "at the time of purchase" can mean only "before the purchase" and that since Emerson owned no Dodge securities prior to June 16, 1967, and had no access to "inside" information, it may not be subjected to Section 16(b) liability. We do not agree.
Passing for the moment Emerson's further contention that its acquisition of the stock was not a "purchase" within the meaning of the Act, we are convinced that "at the time of purchase" includes the time "simultaneously with" the purchase, so that a shareholder becomes subject to the provisions of Section 16(b) immediately upon (that is, at the very moment of) his acquisition of more than 10 per cent of the corporation's stock. This construction *590 accords not only with the literal meaning of the language, but more importantly, best serves to effectuate the legislative purpose manifest in Section 16(b). Accord: Stella v. Graham-Paige Motors Corporation, D.C.N.Y., 104 F. Supp. 957, affirmed (on this point) 2 Cir., 232 F.2d 299, cert. den. 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52. See Cook & Feldman, Insider Trading Under the Securities Exchange Act, 66 Harvard Law Review 612, 631-632.
Emerson urges, however, that although the transaction by which it acquired more than 10 per cent of Dodge stock was in fact a "purchase" (and indeed, under any view, a cash acquisition of this nature could not be otherwise) nevertheless it was not a "purchase" of the kind contemplated by Section 16(b). Its theory is that each case must be examined on its own peculiar facts (Petteys v. Butler, 8 Cir., 367 F.2d 528), and that since the only evidence of record is to the effect that Emerson had no access to and had not acquired "insider" information prior to the purchase, its acquisition of a 13.2 per cent interest was not one that could have lent itself to the practices Section 16(b) was enacted to prevent. Again, we do not agree.
We do not believe that Congress intended to exclude any transaction which is undeniably a purchase under any concept thereof. In the cases in which the facts were examined by the courts, the issue was whether a particular transaction which did not involve a purchase (or a sale) within the ordinary understanding of those terms, e. g. conversions and reclassifications of stock, was a purchase (or a sale) as defined by Section 3 of the Act. It was to aid in resolving problems of that nature that the courts have created the following test or standard: "Every transaction which can reasonably be defined as a purchase will be so defined, if the transaction is of a kind which can possibly lend itself to the speculation encompassed by Section 16(b)." Ferraiolo v. Newman, 6 Cir., 259 F.2d 342, 345. This is the test applied by the Eighth Circuit. Petteys v. Butler, 8 Cir., 367 F.2d 528.
Petteys involved a conversion transaction and the Court held that under the "unique facts" of that case the conversion of convertible preferred stock to common stock by non-controlling directors was not a purchase within the purview of the Act even though it might "represent a type of exchange of equivalents that can be read into a literal interpretation of the § 16(b) language of `otherwise acquire' and `otherwise dispose of'". What Petteys ruled is succinctly summarized by Judge Gibson as follows (367 F.2d, l. c. 536): "If no purpose is served by attaching the artificial label of `purchase' to a transaction when it has none of the common indicia of a purchase, no such label is demanded, nor will one be attached. This, we believe to be the correct law and it is the law to be applied by us to the facts of this case."
In the instant case, no artificial label of "purchase" is attempted. The transaction by which Emerson acquired the Dodge stock has all the "common indicia" of a purchase. Here, we do not have an "otherwise acquire" situation, but rather, a simple, conventional acquisition of stock for cash.
We hold that the transaction was a purchase under any view of the facts. By such purchase, Emerson "elected to become a statutory fiduciary", thereby becoming subject "to the disciplinary effect of § 16(b)", Western Auto Supply Company v. Gamble-Skogmo, Inc., 8 Cir., 348 F.2d 736, regardless of the actual availability or use of inside information. The possibility of insider abuse is inherent in every such transaction. The expressed purpose of the statute is to prevent the unfair use of information which may have been obtained by the beneficial owner. Clearly, Section 16(b) is applicable to Emerson's August 28, 1967 sale for cash of 37,000 shares of Dodge stock.
The basis on which Emerson disclaims liability as to said sale is that it was *591 "forced" to dispose of these shares because of the foregone conclusion that the Dodge-Reliance merger would be approved very shortly with the result that the consummation of the merger would, so it is claimed, be treated as a sale of the Emerson-held Dodge shares in exchange for shares of Reliance. We are not convinced that the exchange of shares incidental to the merger would necessarily involve a "sale" of the Dodge stock held by Emerson. The cases cited by Emerson on this point go no further than to hold that for purposes of the anti-fraud provisions of the Act, the acquisition of new stock for the old, resulting from a statutory merger, is deemed a purchase and sale. Dasho v. Susquehanna Corporation, 7 Cir., 380 F.2d 262. And see SEC v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668. Thus, in the SEC case, the Supreme Court noted that the meaning of particular phrases in statutes must be determined in context and that the same words may take on a different coloration in different sections of the securities laws. The Court stated, "We must therefore address ourselves to the meaning of the words `purchase or sale' in the context of § 10(b). Whatever these or similar words may mean in the numerous other contexts in which they appear in the securities laws, only this one narrow question is presented here." And again, "Whatever the terms `purchase' and `sale' may mean in other contexts, here an alleged deception has affected individual shareholders' decisions in a way not at all unlike that involved in a typical cash sale or share exchange. The broad antifraud purposes of the statute and the rule would clearly be furthered by their application to this type of situation."
Hence, it is not at all certain that in the context of Section 16(b) the word "sale" would be construed to include the involuntary exchange by Emerson of the Dodge shares for those of Reliance pursuant to the merger. Inasmuch as such a transaction is an "otherwise dispose of" situation, and not a typical or conventional sale, the rationale of Petteys, supra, would undoubtedly require an examination of the "unique" facts of the case to determine whether the purposes of Section 16(b) would be furthered by attaching the artificial label of "sale" to this type of situation. However, we need not decide whether Emerson would have been liable for Section 16(b) profits had it held the Dodge shares until the merger was consummated, since it did not do so and the question is now moot.
Reduced to its essentials, what Emerson is saying is that it should be permitted to retain its short-swing profits resulting from the cash sale of the 37,000 shares of stock, because otherwise it would have been required to account to Reliance for the short-swing paper profits it would have realized upon the consummation of the merger. Yet the very purpose of Section 16(b) is to prevent the retention of such short-swing profits. Under any view of the case, Emerson is liable for Section 16(b) profits on its sale for cash of the 37,000 shares of Dodge stock.
Less obvious is the resolution of the further question: Should Emerson be held accountable for the profits realized on the September 13 sale of its remaining 115,282 shares even though at that time (by reason of its prior disposition of the 37,000 shares) Emerson was the beneficial owner of less than 10% of Dodge shares? We have concluded that under the peculiar facts of this case, Section 16(b) is applicable to the September 13 transaction.
We are convinced that while Emerson was the beneficial owner of 13.2% of Dodge shares, it determined to dispose of its entire stock holdings pursuant to a plan whereby it hoped to avoid, to the extent possible, Section 16(b) liability for short-term profits. The guidelines of the plan were formulated in a letter written by its counsel to its board chairman under date of June 26, 1967. In that letter, counsel discussed alternatives to a proxy contest with Reliance, "principally *592 how to dispose of, at a profit, the shares of Dodge stock which Emerson now owns." He took note of the "uncertainty" whether the very purchase whereby Emerson became the holder of more than 10% of the Dodge stock should be taken into account for Section 16(b) purposes and advised that "Emerson should proceed on the assumption that 16(b) does apply and should seek to avoid its consequences." It was counsel's opinion that if a merger occurred, Emerson would be considered to have "sold" its Dodge shares for Section 16 (b) purposes. On that premise, he outlined "defensive action against 16(b) possibilities" which in his opinion should be taken by Emerson: "The initial defensive step * * * is for Emerson to reduce its holdings of Dodge stock to less than 10%. This means the gift or sale * * * of 37,100 shares of Dodge stock owned by Emerson. From this point on, Emerson, no longer being a 10% stockowner of Dodge can sell the balance of its Dodge stock free of any 16(b) risks; provided, of course, the second sale is not legally tied in any way to the first sale."
Because of the manner in which this case was submitted, the facts were not fully developed, as they might have been through vigorous cross-examination. However, the actions of Emerson when viewed in the light of its counsel's letter, clearly bespeak the fact that although the two sales of Dodge stock were technically separate transactions and the second sale was not "legally" tied in any way to the first sale, the two sales were effected pursuant to a single pre-determined plan of disposition with the overall intent and purpose of avoiding Section 16(b) liability. Emerson's initial sale of 37,000 shares[1] was motivated solely by its desire to reduce its holding to just under 10% immediately prior to disposing of the balance of its shares in an attempt to escape Section 16(b) liability on the short-swing profits it contemplated would be made upon such remaining shares. Significantly, the negotiations with Reliance commenced just one day after Emerson agreed by telephone conversation to sell the initial 37,000 shares to Goldman, Sachs & Company, and the agreement for the sale was tentatively arrived at one week thereafter subject only to the formalizing of the understanding. The timing was not a happenstance. That the negotiations with Reliance for the sale of the Emerson-held Dodge shares were initiated by Reliance does not affect our conclusion that the two sales were in fact interrelated parts of a single plan. In fact, in his June 26 letter, Emerson's counsel had anticipated the possibility of a settlement under a negotiated agreement providing for the purchase of the Dodge shares owned by Emerson, the settlement to provide for a sale by Emerson of at least 37,100 of its Dodge shares before the merger was approved by the stock-holders.
Looking through form to discern substance, we hold that in truth and in fact the two sale transactions were related parts of a single plan devised by Emerson to dispose of all its Dodge stock in an attempt to "avoid the consequences" of Section 16(b). Emerson may not thus insulate from Section 16(b) liability the short-term profits derived from its disposition of the Dodge stock. To sanction this two-step sale procedure would be to subvert the purposes of Section 16(b) and to produce a result plainly at variance with its manifest policy. Unless appearances are to control, rather than reality, we believe that for purposes of this case the "time of sale" should include the entire period during which a series of related transactions take place pursuant to a plan by which a 10% beneficial owner disposes of his stock holdings.
We do not question the good faith of Emerson or its counsel. What we do *593 question is its right to excise 16(b) liability or "avoid its consequences" by utilizing a series of related transactions, some of which considered separately might be exempt, when the obvious substance of the transaction as a whole is the disposition of its more than 10% beneficial interest.
We hold that Emerson is liable to Reliance, as the successor in interest to Dodge, for the net profits realized by Emerson from the sale of all its 152,282 shares of Dodge stock. Counsel for Reliance are directed to submit a form of interlocutory declaratory judgment in accordance herewith.
The foregoing memorandum constitutes our findings of fact and conclusions of law on the issue of liability.
NOTES
[1] An increase in the number of Dodge outstanding shares made it necessary to sell only 37,000 instead of 37,100 shares as suggested in counsel's letter in order to reduce Emerson's holdings to less than 10%.