RELIANCE ELECTRIC CO. *v.* EMERSON
ELECTRIC CO.

No. 70–79.   Argued November 10–11, 1971—
Decided January 11, 1972

*Thomas P. Mulligan* argued the cause for petitioner. With him on the briefs were *Patrick J. Amer, Stephen J. Burns,* and *Kenneth S. Teasdale.*

*Albert E. Jenner, Jr.,* argued the cause for respondent. With him on the brief were *Wesley G. Hall, R. H. McRoberts,* and *Thomas C. Walsh.*

*Walter P. North* argued the cause for the Securities and Exchange Commission as *amicus curiae.* With him on the briefs were *Solicitor General Griswold, Samuel Huntington, Philip A. Loomis, Jr.,* and *Jacob H. Stillman.*

*Whitney North Seymour* and *John A. Guzzetta* filed a brief for Gulf & Western Industries, Inc., as *amicus curiae.*

MR. JUSTICE STEWART delivered the opinion of the Court.

Section 16 (b) of the Securities Exchange Act of 1934, 48 Stat. 896, 15 U. S. C. § 78p (b), provides, among other things, that a corporation may recover for itself the profits realized by an owner of more than 10% of its shares from a purchase and sale of its stock within any six-month period, provided that the owner held more than 10% "both at the time of the purchase and sale." [1] In this case, the respondent, the owner of 13.2% of a corporation's shares, disposed of its entire holdings in two sales, both of them within six months of purchase. The

---

[1] Section 16 (b) provides:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. . . . This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." 15 U. S. C. § 78p (b).

The term "such beneficial owner" refers to one who owns "more than 10 per centum of any class of any equity security (other than an exempted security) which is registered pursuant to section 12 of this title." Securities Exchange Act of 1934, § 16 (a), 15 U. S. C. § 78p (a).

first sale reduced the respondent's holdings to 9.96%, and the second disposed of the remainder. The question presented is whether the profits derived from the second sale are recoverable by the Corporation under § 16 (b). We hold that they are not.

## I

On June 16, 1967, the respondent, Emerson Electric Co., acquired 13.2% of the outstanding common stock of Dodge Manufacturing Co., pursuant to a tender offer made in an unsuccessful attempt to take over Dodge. The purchase price for this stock was $63 per share. Shortly thereafter, the shareholders of Dodge approved a merger with the petitioner, Reliance Electric Co. Faced with the certain failure of any further attempt to take over Dodge, and with the prospect of being forced to exchange its Dodge shares for stock in the merged corporation in the near future,[2] Emerson, following a plan outlined by its general counsel, decided to dispose of enough shares to bring its holdings below 10%, in order to immunize the disposal of the remainder of its shares from liability under § 16 (b). Pursuant to counsel's recommendation, Emerson on August 28 sold 37,000 shares of Dodge common stock to a brokerage house at $68 per share. This sale reduced Emerson's holdings in Dodge to 9.96% of the outstanding common stock. The remaining shares were then sold to Dodge at $69 per share on September 11.

After a demand on it by Reliance for the profits realized on both sales, Emerson filed this action seeking a declaratory judgment as to its liability under § 16 (b). Emerson first claimed that it was not liable at all,

---

[2] The Court of Appeals for the Second Circuit has held that an exchange of shares in one corporation for those of another pursuant to a merger agreement constitutes a "sale" within the meaning of § 16 (b). *Newmark* v. *RKO General, Inc.*, 425 F. 2d 348, 354.

because it was not a 10% owner at the time of the *purchase* of the Dodge shares. The District Court disagreed, holding that a purchase of stock falls within § 16 (b) where the purchaser becomes a 10% owner by virtue of the purchase. The Court of Appeals affirmed this holding, and Emerson did not cross-petition for certiorari. Thus that question is not before us.

Emerson alternatively argued to the District Court that, assuming it was a 10% stockholder at the time of the purchase, it was liable only for the profits on the August 28 sale of 37,000 shares, because after that time it was no longer a 10% owner within the meaning of § 16 (b). After trial on the issue of liability alone, the District Court held Emerson liable for the entire amount of its profits. The court found that Emerson's sales of Dodge stock were "effected pursuant to a single predetermined plan of disposition with the overall intent and purpose of avoiding Section 16 (b) liability," and construed the term "time of . . . sale" to include "the entire period during which a series of related transactions take place pursuant to a plan by which a 10% beneficial owner disposes of his stock holdings" 306 F. Supp. 588, 592.

On an interlocutory appeal under 28 U. S. C. § 1292 (b), the Court of Appeals upheld the finding that Emerson "split" its sale of Dodge stock simply in order to avoid most of its potential liability under § 16 (b), but it held this fact irrelevant under the statute so long as the two sales are "not legally tied to each other and [are] made at different times to different buyers . . . ." 434 F. 2d 918, 926. Accordingly, the Court of Appeals reversed the District Court's judgment as to Emerson's liability for its profits on the September 11 sale, and remanded for a determination of the amount of Emerson's liability on the August 28 sale. Reliance filed a petition for certiorari, which we granted

in order to consider an unresolved question under an important federal statute. 401 U. S. 1008.

## II

The history and purpose of § 16 (b) have been exhaustively reviewed by federal courts on several occasions since its enactment in 1934. See, *e. g., Smolowe* v. *Delendo Corp.,* 136 F. 2d 231; *Adler* v. *Klawans,* 267 F. 2d 840; *Blau* v. *Max Factor & Co.,* 342 F. 2d 304. Those courts have recognized that the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great. As one court observed:

> "In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16 (b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect." *Bershad* v. *McDonough,* 428 F. 2d 693, 696.

Thus Congress did not reach every transaction in which an investor actually relies on inside information. A person avoids liability if he does not meet the statutory definition of an "insider," or if he sells more than six months after purchase. Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16 (b). The question is, rather, whether the method used to "avoid" liability is one permitted by the statute.

Among the "objective standards" contained in § 16 (b) is the requirement that a 10% owner be such "both at the time of the purchase and sale . . . of the security involved." Read literally, this language clearly contemplates that a statutory insider might sell enough shares to bring his holdings below 10%, and later—but still within six months—sell additional shares free from liability under the statute. Indeed, commentators on the securities laws have recommended this exact procedure for a 10% owner who, like Emerson, wishes to dispose of his holdings within six months of their purchase.[3]

Under the approach urged by Reliance, and adopted by the District Court, the apparent immunity of profits derived from Emerson's second sale is lost where the two sales, though independent in every other respect, are "interrelated parts of a single plan." 306 F. Supp., at 592. But a "plan" to sell that is conceived within six months of purchase clearly would not fall within § 16 (b) if the sale were made after the six months had expired, and we see no basis in the statute for a different result where the 10% requirement is involved rather than the six-month limitation.

The dissenting opinion, *post,* at 442, reasons that "the 10% rule is based upon a conclusive statutory presumption that ownership of this quantity of stock suffices to

---

[3] "[A] person who owns 15 percent and wants to sell down to 5 percent should sell 5-plus percent in one transaction and then, after he becomes a holder of slightly less than 10 percent, sell out the remainder." 2 L. Loss, Securities Regulation 1060 (2d ed. 1961).

"[T]he intention of the language was to exclude the second sale in a case where 10% is purchased, 5% sold within three months and the remaining 5% a month later. This latter construction of the Act is, it is believed, the only safe one to rely upon." Seligman, Problems Under the Securities Exchange Act, 21 Va. L Rev. 1, 20 (1934).

provide access to inside information," and that it thus "follows that all sales by a more-than-10% owner within the six-month period carry the presumption of a taint, even if a prior transaction within the period has reduced the beneficial ownership to 10% or below." While there may be logic in this position, it was clearly rejected as a basis for liability when Congress included the proviso that a 10% owner must be such both at the time of the purchase and of the sale. Although the legislative history affords no explanation of the purpose of the proviso, it may be that Congress regarded one with a long-term investment of more than 10% as more likely to have access to inside information than one who moves in and out of the 10% category. But whatever the rationale of the proviso, it cannot be disregarded simply on the ground that it may be inconsistent with our assessment of the "wholesome purpose" of the Act.

To be sure, where alternative constructions of the terms of § 16 (b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders.[4] But a construction of the term "at the time

[4] See, e. g., Adler v. Klawans, 267 F. 2d 840 (one who is a director at the time of sale need not also have been a director at the time of purchase). In interpreting the terms "purchase" and "sale," courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse. See, e. g., Bershad v. McDonough, 428 F. 2d 693 (granting of an option to purchase constitutes a "sale"). And in deciding whether an investor is an "officer" or "director" within the meaning of § 16 (b), courts have allowed proof that the investor performed the functions of an officer or director even though not formally denominated as such. Colby v. Klune, 178 F. 2d 872, 873; cf. Feder v. Martin Marietta Corp., 406 F. 2d 260, 262–263. The various tests employed in these cases are used to determine whether a transaction, objectively defined, falls within or without the terms of the statute. In no case is liability predicated upon "considerations of intent, lack of motive, or improper conduct" that are irrelevant in § 16 (b) suits. Blau v. Oppenheim, 250 F. Supp. 881, 887.

of . . . sale" that treats two sales as one upon proof of a pre-existing intent by the seller is scarcely in harmony with the congressional design of predicating liability upon an "objective measure of proof." *Smolowe* v. *Delendo Corp., supra,* at 235. Were we to adopt the approach urged by Reliance, we could be sure that investors would not in the future provide such convenient proof of their intent as Emerson did in this case. If a "two-step" sale of a 10% owner's holdings within six months of purchase is thought to give rise to the kind of evil that Congress sought to correct through § 16 (b), those transactions can be more effectively deterred by an amendment to the statute that preserves its mechanical quality than by a judicial search for the will-o'-the-wisp of an investor's "intent" in each litigated case.

## III

The Securities and Exchange Commission, participating as *amicus curiae,* argues for an interpretation of the statute that both covers Emerson's transaction and preserves the mechanical quality of the statute. Seizing upon a fragment of legislative history—a brief exchange between one of the principal authors of the bill and two members of the Senate Committee during hearings on the bill [5]—the Commission suggests that the sole pur-

---

[5] That exchange was as follows:

"Senator CAREY. Suppose this stock passed to an estate, and the estate had to raise money?

"Mr. CORCORAN. I do not think, in that case, sir, the statute would apply.

"Senator KEAN. Why not?

"Senator CAREY. The estate is the beneficiary.

"Mr. CORCORAN. I do not believe it would. Certainly the intention was that it should not apply to that sort of a situation." Hearings on Stock Exchange Practices before the Senate Committee on Banking and Currency pursuant to S. Res. 84, 56, and 97, 73d Cong., 1st and 2d Sess., pt. 15, p. 6558. It was sometime after this exchange that the bill was revised to add the exemptive provision.

pose of the requirement of 10% ownership at the time of both purchase and sale was to exclude from the statute's coverage those persons who became 10% shareholders "involuntarily," as, for example, by legal succession or by a reduction in the total number of outstanding shares of the corporation. The effect of such an interpretation would be to bring within § 16 (b) all sales within six months by one who has gained the position of a 10% owner through voluntary purchase, regardless of the amount of his holdings at the time of the sale. We cannot accept such a construction of the Act.

In the first place, we note that the SEC's own rules undercut such an interpretation. Recognizing the interrelatedness of § 16 (a) and § 16 (b) of the Act, the Commission has used its power to grant exemptions under § 16 (b) to exclude from liability any transaction that does not fall within the reporting requirements of § 16 (a).[6] A 10% owner is required by that section to report at the end of each month any changes in his holdings in the corporation during that month. The Commission has interpreted this provision to require a report only if the stockholder held more than 10% of the corporation's shares at some time during the month.[7] Thus, a 10% owner who, like Emerson, sells down to 9.96% one month and disposes of the remainder the following month, would presumably be exempt from the reporting requirement and hence from § 16 (b) under the SEC's own rules, without regard to whether he acquired the stock "voluntarily."

But the SEC's argument would fail even if it were not contradicted by the Commission's own previous construction of the Act. As we said in *Blau* v. *Lehman*,

---

[6] SEC Rule 16a–10, 17 CFR § 240.16a–10.

[7] Form 4, Securities Exchange Act Release No. 6487 (Mar. 9, 1961).

368 U. S. 403, 411, one "may agree that . . . the Commission present[s] persuasive policy arguments that the Act should be broadened . . . to prevent 'the unfair use of information' more effectively than can be accomplished by leaving the Act so as to require forfeiture of profits only by those specifically designated by Congress to suffer those losses." But we are not free to adopt a construction that not only strains, but flatly contradicts, the words of the statute.

The judgment is

*Affirmed.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE WHITE concur, dissenting.

On June 16, 1967, Emerson Electric Co., in an attempt to wrest control from the incumbent management, acquired more than 10% of the outstanding common stock of Dodge Manufacturing Co. Dodge successfully resisted the take-over bid by means of a defensive merger with petitioner, Reliance Electric Co. Emerson then sold the shares it had accumulated, within six months of their purchase, for a profit exceeding $900,000.

Because this sale purportedly comprised two "independent" transactions, the first of which reduced Emerson's holdings to 9.96% of the outstanding Dodge common stock, the Court today holds that the profit from the second transaction is beyond the contemplation of § 16 (b) of the Securities Exchange Act.[1] So Emerson

---

[1] 15 U. S. C. § 78p (b):

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any

need not account to the corporation for these gains. In my view, this result is a mutilation of the Act, contrary to its broad remedial purpose, inconsistent with the flexibility required in the interpretation of securities legislation, and not required by the language of the statute itself.

I

Section 16 (b) is a "prophylactic" rule, *Blau* v. *Lehman,* 368 U. S. 403, 413, whose wholesome purpose is to control the insiders whose access to confidential information gives them unfair advantage in the trading of their corporation's securities.[2]

---

period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

[2] "Next comes the everlasting problem of protecting the fellow on the outside from the insider . . . . That is, the problem of protecting the stockholder—and every fellow who buys into the market is a stockholder—who does not know as much about the company as the fellow on the inside. . . . [T]he poor little fellow does not know what he is getting into, and it is just as important in preventing unwarranted and destructive speculation, to have the fellow on the outside protected from the fellow on the inside who is an officer or director of the corporation or a pool with inside information, as

The congressional investigations which led to the enactment of the Securities Exchange Act unearthed convincing evidence that disregard by corporate insiders of their fiduciary positions was widespread and pervasive.[3] Indeed,

> "the flagrant betrayal of their fiduciary duties by directors and officers of corporations who used their positions of trust and the confidential information which came to them in such positions, to aid them in their market activities,"

it is not to let the little fellow buy too much stock by setting the margins too low." Hearings on H. R. 7852 and H. R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 85 (1934) (testimony of Thomas Corcoran).

[3] One particularly glaring example concerned two brothers whose ownership of a little over 10% of a company's stock gave them a controlling interest. Just before the company voted to omit a dividend, the brothers disposed of their holdings for about $16,000,000. When news of the dividend omission became public a short time later, they repurchased an equivalent amount of stock for about $7,000,000, showing a profit of some $9,000,000 on the short-swing deal. S. Rep. No. 792, 73d Cong., 2d Sess., 9 (1934).

Much of the insider abuse involved participation in so-called "pools," which were dummy accounts in a corporation's stock established to buy and sell, at the same time, and at a frenetic pace. By so churning the account, it was often possible to engineer a false impression of immense activity in the stock, and to arrange spectacular, but artificial, price rises. One pool bought and sold almost 1,500,000 shares of RCA stock in a single seven-day period in 1929, at a net profit to its members of almost $5,000,000. S. Rep. No. 1455, 73d Cong., 2d Sess., 32–33, 47 (1934). Another famous pool involved the stock of the American Commercial Alcohol Co. During the summer of 1933, eight insiders and their associates reaped a profit of $300,000 on an investment of $62,000. A third pool, in the stock of the Fox Film Corporation, made $2,000,000 in five months. This pool was notable for the extent to which large stockholders participated. *Id.*, at 55–68. During 1929, over 100 stocks listed on the New York Stock Exchange were subjects of pools. *Id.*, at 32. Insider participation in these pools was ubiquitous. See generally F. Pecora, Wall Street Under Oath (1939).

was reported by the Senate subcommittee charged with the investigation to be "[a]mong the most vicious practices unearthed at the hearings." S. Rep. No. 1455, 73d Cong., 2d Sess., 55 (1934). The subcommittee did not limit its attack to directors and officers.

> "Closely allied to this type of abuse was the unscrupulous employment of inside information by large stockholders who, while not directors and officers, exercised sufficient control over the destinies of their companies to enable them to acquire and profit by information not available to others." *Ibid.*

Despite its flagrantly inequitable character, the most respected pillars of the business and financial communities considered windfall profits from "sure-thing" speculation in their own company's stock to be one of the usual emoluments of their position. Cook & Feldman, Insider Trading Under the Securities Exchange Act, 66 Harv. L. Rev. 385, 386 (1953); 10 SEC Ann. Rep. 50 (1944). These abuses were perpetrated by such ostensibly reliable men and institutions as Richard Whitney, President of the New York Stock Exchange,[4] Albert H. Wiggin and the Chase National Bank, of which he was the chief executive officer,[5] and Charles E. Mitchell and the National City Bank, of which he was Chairman of the Board.[6]

Section 16 (b) was drafted to combat these "predatory operations," S. Rep. No. 1455, *supra,* at 68, by removing all possibility of profit from those short-swing insider trades occurring within the statutory period of six

---

[4] See SEC, Report on Investigation in the Matter of Richard Whitney Pursuant to Section 21 (a) of the Securities Exchange Act of 1934 (Nov. 1, 1938).

[5] See Pecora, *supra,* n. 3, at 131–188.

[6] *Id.,* at 70–130.

months.[7] The statute is written broadly, and the liability it imposes is strict. Profits are forfeit without proof of an insider's intent to gain from inside information, and without proof that the insider was even privy to such information.[8] *Feder* v. *Martin Marietta Corp.*, 406 F. 2d 260, 262 (CA2).

## II

Today, however, in the guise of an "objective" approach, the Court undermines the statute. By the simple expedient of dividing what would ordinarily be a single transaction into two parts—both of which could be performed on the same day, so far as it appears from the Court's opinion—a more-than-10% owner may reap windfall profits on 10% of his corporation's outstanding stock. This result, " 'plainly at variance with the policy of the legislation as a whole,' " *United States* v. *American*

---

[7] The six-month period is, as Mr. Corcoran said during the hearings on the bill, a "crude rule of thumb," Hearings on Stock Exchange Practices before the Senate Committee on Banking and Currency pursuant to S. Res. 84, 56, and 97, 73d Cong., 1st and 2d Sess., pt. 15, p. 6557. It represents a balance struck between the need to deter short-swings based on inside information and a desire to avoid unduly inhibiting long-term corporate investment. S. Rep. No. 792, 73d Cong., 2d Sess., 6. Six months was hit upon, presumably, on the view that "where the insider is obliged to hold the original security . . . for longer than six months . . . market fluctuations are likely to wipe out his profits." Comment, 117 U. Pa. L. Rev. 1034, 1054 (1969).

[8] "This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect." *Bershad* v. *McDonough*, 428 F. 2d 693, 696 (CA7).

It is somewhat anomalous that the majority relies on a feature of the statutory scheme designed to broaden its scope in order to insulate from the operation of the statute a device by which the goals of the statute can be largely frustrated.

*Trucking Assns.,* 310 U. S. 534, 543, is said to be required because Emerson, owning only 9.96%, was not a "beneficial owner" of more than 10% within the meaning of § 16 (b) "at the time of" the disposition of this block of Dodge stock.

If § 16 (b) is to have the "optimum prophylactic effect" which its architects intended, insiders must not be permitted so easily to circumvent its broad mandate. We should hold that there was only one sale—a plan of distribution conceived "at the time" Emerson owned 13.2% of the Dodge stock, and implemented within six months of a matching purchase. Moreover, in the spirit of the Act we should presume that *any* such "split-sale" by a more-than-10% owner was part of a single plan of disposition for purposes of § 16 (b) liability.

This construction of "the sequence of relevant transactions," *Bershad* v. *McDonough,* 428 F. 2d 693, 697 (CA7), is not foreclosed by any language in the statute. The statutory definitions of such terms as "purchase," "sale," "beneficial owner," "insider," and "at the time of" are not, as one might infer from the Court's opinion, objectively defined words with precise meanings.

> " 'Whatever the terms "purchase" and "sale" may mean in other contexts,' they should be construed in a manner which will effectuate the purposes of the specific section of the [Securities Exchange] Act in which they are used. SEC v. National Securities, Inc., 393 U. S. 453, 467." *Id.,* at 696.

MR. JUSTICE STEWART, while on the Court of Appeals, explained the manner appropriate for the construction of the statutory definitions in the context of § 16 (b):

> "Every transaction which can reasonably be defined as a purchase will be so defined, if the transaction is of a kind which can possibly lend itself to the speculation encompassed by Section 16 (b)." *Ferraiolo* v. *Newman,* 259 F. 2d 342, 345 (CA6).

Applying this salutary approach toward the statutory definitions, the courts have reasoned that, because of the opportunities for abuse inhering in his position, a director must account both for purchases made shortly before his appointment, *Adler* v. *Klawans,* 267 F. 2d 840 (CA2), and for sales made shortly after his resignation, *Feder* v. *Martin Marietta Corp., supra.* "Options," which played such a large role in the manipulative practices disclosed during the 1930's,[9] are not ordinarily thought to be "purchases" or "sales" of the underlying commodity; yet, because of the opportunity for abuse inherent in the device, courts have held that an option can be a "sale," when granted, within the meaning of § 16 (b). *Bershad* v. *McDonough, supra.* But, in order to bring the underlying transaction within the six-month limitation of § 16 (b), an option was also held to be a "purchase" when exercised. *Booth* v. *Varian Associates,* 334 F. 2d 1 (CA1). Similarly, where there was an opportunity for the abuse of inside information, a conversion of debentures into common stock was held to be a "sale"; *Park & Tilford* v. *Schulte,* 160 F. 2d 984 (CA2); but where there was no such opportunity, a similar conversion was held not to be. *Blau* v. *Lamb,* 363 F. 2d 507 (CA2).

The common thread running through the decisions is that whether we approach the problem of this case as a question of "beneficial ownership" at the time of the second transaction, or as a question whether the two transactions were one "sale," it "is not in any event primarily a semantic one, but must be resolved in the light of the legislative purpose—to curb short swing speculation by insiders." *Ferraiolo* v. *Newman, supra,* at 344.

Until today, the federal courts have been almost universally faithful to this philosophy, "even departing where necessary from the literal statutory language."

---

[9] See Twentieth Century Fund, Stock Market Control 114–118 (1934).

*Feder* v. *Martin Marietta Corp., supra,* at 262. Thus, a tender offer, although it may justifiably be described as a series of discrete purchases, has been treated as a single purchase. *Abrams* v. *Occidental Petroleum,* 323 F. Supp. 570, 579 (SDNY), rev'd on other grounds, 450 F. 2d 157 (CA2). And, in order to prevent a construction of the statute whereby

> "it would be possible for a person to purchase a large block of stock, sell it out until his ownership was reduced to less than 10%, and then repeat the process, ad infinitum,"

the phrase "at the time of the purchase and sale," on which the Court places such heavy reliance, was defined to mean "simultaneously with" purchase, and "just prior to" sale. *Stella* v. *Graham-Paige Motors,* 104 F. Supp. 957, 959 (SDNY). As one commentator noted, this holding

> "necessitates a logical inconsistency insofar as the phrase 'at the time of purchase and sale' is treated as meaning the moment after purchase and the moment before sale." Recent Developments, 57 Col. L. Rev. 287, 289.

Yet, as in the present case, "the discrepancy seems slight in view of the broader statutory policies involved." *Ibid.*

Thus, should the broadly remedial statutory purpose of § 16 (b) require it, the literal language of the statute would not preclude an analysis in which the two transactions herein at issue are treated as part of a single "sale."

### III

The potential for abuse of inside information in the present case is self-evident. Equally obvious is the fact

that the modern-day insider is no less prone than his counterpart of a generation ago to succumb to the lure of insider trading where windfall profits are in the offing. Indeed, in a survey of "reputable" businessmen, 42% of those responding indicated they would themselves trade on inside information, and 61% believed that the "average" executive would do likewise.[10]   Thus, it would appear both that § 16 (b) was directed at such conduct as is herein at issue and that the protection § 16 (b) affords is as necessary today as it was when the statute was enacted.

Despite the fact that the decision below strikes at the vitals of the statute, the Court says it must be affirmed because to treat "two sales as one upon proof of a pre-existing intent by the seller" detracts from the "mechanical quality" of the statute and is "scarcely in harmony with the congressional design of predicating liability upon an 'objective measure of proof.' " *Ante,* at 425.

This "mechanical quality," however, is illusory.

> "There is no rule so 'objective' ('automatic' would be a better word) that it does not require some mental effort in applying it on the part of the person or persons entrusted by law with its application." *Blau* v. *Lamb, supra,* at 520.

Thus, the deterrent value of § 16 (b) depends not so

---

[10] Baumhart, How Ethical Are Businessmen?, Harv. Bus. Rev., July-Aug. 1961, p. 6, at 16.   The survey had posed the following hypothetical:

"What would you do if . . . as a director of a large corporation, you learned at a board meeting of an impending merger with a smaller company?   Suppose this company has had an unprofitable year, and its stock is selling at a price so low that you are certain it will rise when news of the merger becomes public knowledge." *Id.,* at 7.

much on its vaunted "objectivity" as on its "thorough-going" qualities.

> "We must suppose that the statute was intended to be thoroughgoing, to squeeze all possible profits out of stock transactions, and thus to establish a standard so high as to prevent any conflict between the selfish interest of a fiduciary officer, director, or stockholder and the faithful performance of his duty." *Smolowe* v. *Delendo Corp.,* 136 F. 2d 231, 239 (CA2).

Insiders have come to recognize that "in order not to defeat [§ 16 (b)'s] avowed objective," federal courts will resolve "all doubts and ambiguities against insiders." *Blau* v. *Oppenheim,* 250 F. Supp. 881, 884–885.

Moreover, courts have not shirked this responsibility simply because, as here, such a resolution may require a factual inquiry. In *Blau* v. *Lehman, supra,* this Court said that on an appropriate factual showing, an investment banking firm might be forced to disgorge profits made from short-swing trades in the stock of a corporation on whose board a partner of the firm was "deputized" to sit. *Id.,* at 410. In *Colby* v. *Klune,* 178 F. 2d 872 (CA2), cited by the majority, the court permitted a factual inquiry into the possibility that an individual might be a "de facto" officer or director, although not formally labeled as such. Virtually all courts faced with § 16 (b) problems now inquire into the opportunity for abuse inherent in a particular type of transaction, in order to see if applying the statute would serve its purposes. See, *e. g., Bershad* v. *McDonough, supra; Blau* v. *Max Factor & Co.,* 342 F. 2d 304 (CA9); *Booth* v. *Varian Associates, supra; Ferraiolo* v. *Newman, supra.* And, even under the narrow approach of the majority, I presume it would still be open, in cases like this one, to inquire whether the ostensibly separate sales are "legally

tied." [11]   It follows that the necessity of a factual inquiry is no bar to the application of the statute to the present case.

It is beyond question, of course, that a prime concern of the statute was that a requirement of positive proof of an insider's "intent" would render the statute ineffective.   Insofar as the District Court's approach appears to place the burden on the plaintiff to demonstrate the existence of a "plan of distribution," it is justifiably open to criticism.   The broad sweep of § 16 (b) requires that a minimal burden be placed on putative plaintiffs.

But this goal—elimination of proof problems—is subsidiary to the statute's main aim—curbing insider speculation.   Whatever "mechanical quality" the statute possesses, it was intended to ease the plaintiff's burden, not to insulate the insider's profits.

Thus, we should not conclude, as does the majority, that there is no *enforceable* way to combat the potential

---

[11] Such an inquiry might well be extensive.  The following commentary, aimed at the Court of Appeals decision below, applies with equal force to the majority's approach:

"Even if the statute could be construed as allowing an exception for a severed sale of the final 9.9 percent of stock otherwise within section 16 (b), when are sales to be found separate and independent?  The *Emerson* decision provides no guidelines.  All it says is: 'The factual question as to whether a particular sale is a separate and independent sale is a matter for decision under the peculiar facts of the particular case.  In this regard each case must stand or fall on its own facts.'  What facts?  What of separate sales to the same vendee?  How separate must the parties be—different companies, different corporations, different entities?  Must there be an interval between the sales?  How long?  If *Emerson* is to be followed, would the question be not so much how discreet [*sic*] the sales are as how discreet counsel has been?  The inquiry seems to lead away from the legislative intent that all potential violators be held to the full sanctions of section 16 (b)."   Recent Decisions, 5 Ga. L. Rev. 584, 590 (footnote omitted).

for sharp practices which inheres in the "split-sale" scheme.

> "[T]he 'objective' or 'rule of thumb' approach need not compel a court to wink at the substantial effects of a transaction which is rife with potential sharp practices in order to preserve the easy application of the short-swing provisions under Section 16 (b). Certainly the interest of simple application of the prohibitions of Section 16 (b) does not carry so far as to facilitate evasion of that provision's function by formalistic devices." *Bershad* v. *McDonough, supra,* at 697 n. 5.

A series of sales, spaced close together, is more than likely part of a single plan of disposition. Plain common sense would indicate that Emerson's conduct in the present case had probably been planned, even if there were no confirmation in the form of an admission. It is statistically probable that any series of sales made by a beneficial owner of more than 10%, within six months, in which he disposes of a major part of his holdings, would be similarly connected.

We, therefore, should construe the statute as allowing a rebuttable presumption that any such series of dispositive transactions will be deemed to be part of a single plan of disposition, and will be treated as a single "sale" for the purposes of § 16 (b).[12]   Because the burden

---

[12] Such a presumption is not a novel suggestion in the interpretation of securities legislation. The Securities Act of 1933, 48 Stat. 74, as amended, 15 U. S. C. § 77a *et seq.,* for example, requires that public securities offerings be registered with the SEC.   § 5, 15 U. S. C. § 77e.   But registration is not required of stock sold in a so-called "private placement."   § 4 (2), 15 U. S. C. § 77d (2).   The purchaser of such stock, however, cannot avoid the registration requirements when he resells it unless his original purchase was not made "with a view to . . . distribution."   § 2 (11), 15 U. S. C. § 77b (11).   The difficulties inherent in determining this elusive "view," see 1 L. Loss,

would be on the defendant, not the plaintiff, such a rule would operate with virtually the same less-than-perfectly automatic efficiency that the statute now does, and it would comport far more closely with the statute's broad, remedial sweep than does the approach taken by the Court.

Such a rule would not, moreover, import questions of "intent" into the statutory scheme. Any factual inquiry would involve only an objective analysis of the circumstances of the various dispositions in the series, applying the "various tests" established by the cases "to determine whether a transaction, objectively defined, falls within or without the terms of the statute." *Ante,* at 424 n. 4.

---

Securities Regulation 665–687 (2d ed. 1961), have prompted the suggestion that there be a rebuttable presumption that a sale made within two years of purchase indicates the original purchase was made with a view to distribution. 4 *id.*, at 2652 (Supplement to 2d ed. 1969); see also The Wheat Report, Disclosure to Investors 165 (CCH 1969).

A similar rebuttable presumption applies in the case of a "controlling person" (as defined in Rule 405, 17 CFR § 230.405 (f)). Such a person need not register his sales under the 1933 Act if in any six-month period they amount to no more than 1% of the issuer's outstanding stock. Rule 154, 17 CFR § 230.154. But, "if a plan exists to effect a series of sales during successive 6 months' periods, such sales cannot be considered in the category of routine trades but must be deemed a distribution not exempted by the rule." Securities Act Release No. 4818, 31 Fed. Reg. 2545 (1966).

Different policies, of course, underlie the 1933 and 1934 Acts. Yet, the above-described provisions of the 1933 Act, like § 16 (b) in the 1934 Act, are aimed at deterring certain transactions because of their inherent opportunities for abuse. The 1933 Act presumptions are based on a judgment that a short-term series of sales is statistically likely to reflect an "intent" to engage in a public distribution without registration. The presumption I would apply in the case of § 16 (b) is justified by a similar statistical likelihood that a series of dispositive transactions, like Emerson's, undertaken within six months of a matching purchase, was pursuant to a "plan of disposition."

Only if a beneficial owner carried an affirmative burden of proof—that his series of dispositive transactions was not of a type that afforded him an opportunity for speculative abuse of his position as an insider—should we say that he was not such a beneficial owner "at the time of . . . sale." [13]

## IV

The Court suggests two additional factors militating against Emerson's liability under § 16 (b). First, the Court implies that it is contrary to the SEC's own rules. This argument rests on the power given to the SEC by § 16 (b) to exempt from its scope those transactions that are "not comprehended within the purpose" of the section. Pursuant to this authority, the SEC has promulgated Rule 16a–10, providing that transactions not required to be reported under § 16 (a) are exempt from § 16 (b) as well.

The SEC's reporting requirements are contained in "Form 4." Until recently, this Form required insiders— officers, directors, and more-than-10% owners—only to report transactions occurring in a calendar month in which they met the formal requirements to be denominated such an insider. Emerson sold down to 9.96% in August, then sold out in September. Presumably, it did not have to report the September sale on Form 4, and thus, by operation of Rule 16a–10, the September sale is argued to be exempt from the operations of § 16 (b) as well.

---

[13] It is conceded that Emerson could not meet such a burden in the present case. In general, an insider could perhaps defeat the presumption of a plan by showing "changed circumstances" similar to those required to avoid registration requirements under the private offering exemption of the 1933 Act. See 1 Loss, Securities Regulation, *supra*, at 665–673; 4 *id.*, at 2646–2654 (1969).

Inasmuch as the SEC's power to promulgate such a rule is not "a matter solely within the expertise of the SEC and therefore beyond the scope of judicial review," *Greene* v. *Dietz*, 247 F. 2d 689, 692 (CA2), this argument loses substantially all its force after *Feder* v. *Martin Marietta Corp., supra.* There, the court held, in the face of the identical argument that Rule 16a–10 was invalid, insofar as it operated through Form 4 to exempt transactions by ex-directors from liability under § 16 (b). The court reasoned that the limitation of the reporting requirement to the calendar month in which a transaction occurred was "an arbitary . . . [and] unnecessary loophole in the effective operation of the statutory scheme," *id.*, at 269, because it required reporting of some transactions 30 days after an ex-director's resignation, but insulated others taking place the very next day.

Form 4 did, however, extend § 16 (b) liability to at least some transactions occurring after resignation.

> "Therefore, inasmuch as Form 4, a valid exercise of the SEC's power, has already extended § 16 (b) to cover, in part, an ex-director's activities, a less arbitrarily defined reporting requirement for ex-directors is but a logical extension of § 16 (b) coverage, would be a coverage in line with the congressional aims, and would afford greater assurance that the lawmakers' intent will be effectuated." *Ibid.*[14]

This analysis is equally applicable to the reporting requirements of ex-10% owners.

---

[14] In response to the *Feder* case, the SEC amended its rules to require disclosure of all transactions by directors and officers within six months prior to their appointment and for six months after their resignations. Rule 16a–1, 17 CFR § 240.16a–1 (d), (e) (as amended, Sept. 30, 1969). Thus, the restrictive reporting requirements relied upon by the majority apply only to beneficial owners, itself an arbitrary distinction.

Second, the Court analogizes Emerson's "plan" to a sale "conceived" during the six-month period but not made until after the expiration of the statutory limitation. The Court incorrectly assumes that such a sale could not fall within § 16 (b). If the "conception" were sufficiently concrete to be construed as a "contract to sell," or an "option," there would indeed be liability. Cf. *Bershad* v. *McDonough, supra.* In any event, the analogy fails because the purposes of the six-month rule are different from the purpose of the 10% rule.

The six-month limitation is based on Congress' estimation that beyond this time period, normal market fluctuations sufficiently deter attempts to trade on inside information. *Blau* v. *Max Factor & Co., supra,* at 308. Thus, it is consistent with the statutory scheme to permit an insider to "plan" a sale within the six-month period that will not take place until six months have passed from a matching purchase.

But the 10% rule is based upon a conclusive statutory presumption that ownership of this quantity of stock suffices to provide access to inside information. *Newmark* v. *RKO General, Inc.,* 425 F. 2d 348 (CA2). The rationale of the six-month rule implies that such information will be presumed to be useful during that length of time. It follows that all sales by a more-than-10% owner within the six-month period carry the presumption of a taint, even if a prior transaction within the period has reduced the beneficial ownership to 10% or below.

## V

In sum, neither the statutory language nor the purposes articulated by the majority justify the result reached today. Rather than deprive § 16 (b) of vitality in the course of a vain search for a nonexistent purity of operation, we should reverse the judgment of the Court of Appeals and remand the case for further proceedings.