**Charles D. WINSTON,**
**Plaintiff–Appellant,**

v.

**FEDERAL EXPRESS CORPORATION,**
**Defendant–Appellee.**

No. 87–5549.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 17, 1988.

Decided Aug. 3, 1988.

Ronald Lee Gilman (argued), Farris, Hancock, Gilman, Branan and Hellen, Memphis, Tenn., for plaintiff-appellant.

Veronica F. Coleman, Memphis, Tenn., Stephen J. Pettit (argued), for defendant-appellee.

Before MARTIN, JONES, and NORRIS, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Charles D. Winston appeals the district court's decision to grant summary judgment in favor of the Federal Express Corporation. 659 F.Supp. 647. Winston contends that the court erroneously concluded that he was an "officer" within the meaning of section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), such that the profits realized from his short-swing purchase and sale of stock in Federal Express must be surrendered. We affirm.

In September 1981, Winston was hired by Federal Express to be Vice President of Network Systems. About two years later, he was promoted to Senior Vice President of Electronic Products. In that capacity,

Winston was responsible for the development and implementation of the company's electronic products and systems, such as the company's overnight package delivery service and the company's same-day document delivery service. Winston reported directly to the chief operating officer, and he had substantial supervisory responsibilities.

On August 27, 1985, Winston resigned from Federal Express. Although his resignation was not to become effective until September 30, 1985, Winston ceased performing any duties for Federal Express as of August 27, and he was replaced almost immediately. Until September 30, however, Winston remained on the Federal Express payroll. Moreover, until the date of his resignation became effective, Winston was available to discuss transition matters with his successor, although he was never actually consulted by the company after August 27.

In fact, Winston's only contact with Federal Express after he resigned occurred on September 30 when he visited the company's offices in order to exercise options to purchase 8,298 shares of Federal Express stock. According to Winston, the sole reason that the effective date of his resignation was postponed was that the option to purchase 2,000 of those shares did not vest until September 26, 1985.

On March 26, 1986, Winston sold the shares he had purchased on September 30 for a profit in excess of $176,000. The stock was sold through a brokerage house which erroneously advised him that the "settlement date," as opposed to the "trade date," determined the date of the transaction for both tax and securities law purposes. Section 16 of the Exchange Act, which was designed to prevent insiders from taking advantage of their access to non-public information, provides that any profit realized by a beneficial owner, officer, or director of an issuer of stock from the purchase and sale of that issuer's stock within any six-month period shall be retained by the issuer. If the brokerage house's advice had been accurate, the transaction would have fallen outside the six-month short-swing profit period. When Winston informed Federal Express of the transaction, however, the company explained to him that the trade date was determinative. Therefore, Winston had technically engaged in a short-swing transaction under section 16(b), and Federal Express was entitled to recoup the profits from the sale.

Winston brought suit in federal court to recover those profits. In his complaint, Winston alleged that, because he did not actively participate in the duties of his office after August 27, he was not an officer of the company for the purposes of section 16(b) when he bought the stock at issue here on September 30. The district court, however, granted Federal Express' motion for summary judgment, finding that Winston was an officer within the meaning of section 16(b). We agree.

Section 16(b) was intended to protect the investing public from the "evils of insider trading" by enacting "a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972). "It does not matter whether the insider actually received the information, or utilized it; his mere status makes him liable." *National Medical Enterprises, Inc. v. Small*, 680 F.2d 83, 84 (9th Cir.1982). A strict-liability "approach maximize[s] the ability of the rule to eradicate speculative abuses by reducing difficulties in proof." *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir.1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971). Because Congress intended section 16(b) to be a "relatively arbitrary rule capable of easy administration," *id.*, courts generally interpret the statute so as to preserve its "mechanical quality." *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. at 425, 92 S.Ct. at 600. In deciding whether an individual is an officer for purposes of section 16(b), therefore, courts tend to look solely at the title the individual holds.

An exception exists, however, "where the title is essentially honorary or ceremonial,"

*National Medical Enterprises, Inc. v. Small,* 680 F.2d at 84, or where the "title was purely 'titular' and not real." *Gold v. Sloan,* 486 F.2d 340, 351 (4th Cir.1973), *reh'g denied,* 491 F.2d 729, *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974). In such cases, the individual's transactions are not subject to section 16(b) restrictions because the person does not actually perform executive functions that put him or her in a position of being able to acquire the kind of confidential information about the company's affairs that provides an advantage in dealing in the company's securities. In effect, a title

> does no more than raise an inference that the person who holds the title has the executive duties and the opportunities for confidential information that the title implies. The inference can be overcome by proof that the title ... did not carry with it any of the executive responsibilities that might otherwise be assumed.

*Merrill Lynch, Pierce, Fenner & Smith v. Livingston,* 566 F.2d 1119, 1122 (9th Cir. 1978).

Here, however, we are presented with a rather unusual case. Winston concedes that, up until he tendered his resignation, he exercised substantial executive responsibilities and that he did have access to confidential information. He contends, though, that he ceased performing such duties after August 27 and that, therefore, the stock he purchased on September 30 is not subject to the short-swing profit rule. In such a circumstance, however, the presumption that the officer continues to have access to confidential information during the interim period is a strong one, and the officer must produce substantial evidence to overcome this presumption.

We believe the evidence adduced by Winston is clearly insufficient to rebut the presumption that he continued to have access to confidential information until September 30. Winston testified that, after he ten-

dered his resignation on August 27, he only returned to the company's office once, on September 30, to exercise his stock options. He also testified that, although he was available to help his successor during the interim period, he was never actually consulted. This testimony is uncontroverted. It is also inconsequential, however, because Winston failed to produce any evidence that, had he requested access to the kind of confidential information which routinely crossed his desk prior to his resignation, such access would have been denied by the company. Winston also failed to offer any evidence that other officers and management personnel were expressly instructed that they were not to provide him confidential information. In short, although he was an officer in title only during the interim period, Winston offered no evidence that the company had constructed a kind of "Chinese wall" around him, shielding him from potential access to current confidential information.

The relatively short period of time between his tendered resignation and the date it became effective is also a factor here. Winston relies heavily on *Gold v. Scurlock,* 324 F.Supp. 1211 (E.D.Va.1971), *aff'd in part, rev'd in part sub nom., Gold v. Sloan,* 486 F.2d 340 (4th Cir.1973). In *Gold,* the court concluded that an officer who previously had access to cofidential information was not an officer for purposes of section 16(b) because, at the time of the relevant transaction, the officer's duties "were mere staff functions—routine administrative chores." *Id.* 1215. In *Gold,* however, the officer had "ceased being an important cog" in the company's management team more than a year before the transaction in question. *Id.* Here, the interim period was only one month. Such a brief period is insufficient evidence, standing alone, to rebut the presumption that Winston continued to have potential access to confidential information until September 30.[1]

---

1. We do not mean to imply that, had the interim period been substantially longer here, we would have found in Winston's favor; that case is not now before us. Rather, we distinguish *Gold* merely to respond to Winston's arguments and to express our agreement with the district court that, without other evidence to show that Winston did not have access to current confidential information, a relatively brief time period is

We recognize that the result in this case may appear harsh. There have been no allegations that Winston exploited confidential information, and he sold the stock only four days before the expiration of the six-month short-swing profit period on the basis of erroneous "expert" advice. Moreover, had he waited those few days, his profit would have been even greater because the price of Federal Express continued to rise after he sold his shares. Unfortunately for Mr. Winston, however, such seemingly unjust results are an inevitable consequence of a strict-liability rule which is necessarily arbitrary. The statutory scheme "place[s] responsibility for meticulous observance of the provision upon the shoulders of the insider.... [and he or she] must bear the risks of any inadvertent miscalculation." *Bershod v. McDonough,* 428 F.2d at 696.

In sum, we hold that an officer who previously exercised executive responsibilities can escape section 16(b) liability prior to the effective date of his or her resignation if there is substantial evidence to rebut the presumption that he or she continued to have access to confidential information during the interim period. The burden is on the officer seeking to avoid a section 16(b) forfeiture to prove that there was no potential access to current information; it is not enough to show that he or she did not actually gain access to such information. We conclude that Winston failed to produce the evidence needed to overcome this strong presumption.

Accordingly, the judgment of the district court in favor of Federal Express is hereby affirmed.

insufficient evidence to rebut the presumption of a continued access to such information.