**H. PERINE, Plaintiff-Appellant,**

v.

**WILLIAM NORTON & COMPANY, INC., et al., Defendants,**

**William Norton & Company, Inc., Defendant-Respondent.**

**No. 128, Docket 74–1573.**

United States Court of Appeals, Second Circuit.

Argued Oct. 4, 1974.

Decided Dec. 20, 1974.

---

Stanley L. Kaufman, New York City (Allan K. Peckel, Kaufman, Taylor, Kimmel & Miller, New York City, of counsel), for plaintiff-appellant.

Donald A. Derfner, New York City (Robert Bartels, Richard M. Kraver, Feldshuh & Frank, New York City, of counsel), for defendant-respondent.

Lawrence E. Nerheim, Gen. Counsel, S.E.C., Washington, D. C. (Walter P. North, Senior Asst. Gen. Counsel, Jacob

H. Stillman, Asst. Gen. Counsel, Theodore L. Freedman, Atty., S.E.C., Washington, D. C., of counsel), for amicus curiae Securities and Exchange Commission.

Before HAYS, ANDERSON and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

Invoking § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b),[1] commonly known as the "short swing profits" provision, H. Perine, a stockholder of Designcraft Jewel Industries, Inc. ("Designcraft"), brought this stockholder's derivative action against William Norton & Company, Inc. ("Norton"), a broker-dealer in securities, to recover the profits earned by it in its underwriting of the distribution within six months of 250,000 shares of Designcraft's common stock, which represented more than 10% of the latter's issued and outstanding common shares. Prior to the underwriting Norton was not an insider of Designcraft (i. e., an officer, director, or beneficial owner of more than 10% of Designcraft's stock). The district court, in an opinion by Judge Ward reported at 372 F.Supp. 341 (S.D.N.Y.1974), held that while § 16(b) is applicable to the underwriting transaction, Rule 16b–2, 17 C.F.R. § 240.16b–2,[2] provides an exemption from the application of the statute in these circumstances. We affirm in part and remand.

1. Section 16(b) provides:

"(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

2. Rule 16b–2, 17 C.F.R. § 240.16b–2(a), provides:

"(a) Any transaction of purchase and sale, or sale and purchase, of a security which is effected in connection with the distribution of a substantial block of securities shall be exempt from the provisions of section 16(b) of the Act, to the extent specified in this [rule], as not comprehended within the purpose of said section, upon the following conditions:

"(1) The person effecting the transaction is engaged in the business of distributing securities and is participating in good faith, in the ordinary course of such business, in the distribution of such block of securities;

"(2) The security involved in the transaction is (i) a part of such block of securities and is acquired by the person effecting the transaction, with a view to the distribution thereof, from the issuer or other person on whose behalf such securities are being distributed or from a person who is participating in good faith in the distribution of such block of securities, or (ii) a security purchased in good faith by or for the account of the person effecting the transaction for the purpose of stabilizing the market price of securities of the class being distributed or to cover an over-allotment or other short position created in connection with such distribution; and

"(3) Other persons not within the purview of section 16(b) of the Act are participating in the distribution of such block of securities on terms at least as favorable as those on which such person is participating and to an extent at least equal to the aggregate participation of all persons exempted from the provisions of section 16(b) of the Act by this [rule]. However, the performance of the functions of manager of a distributing group and the receipt of a bona fide payment for performing such functions shall not preclude an exemption which would otherwise be available under this [rule]."

On May 23, 1972, Designcraft made a public offering of 300,000 shares of its common stock. The total outstanding common stock of Designcraft, including the 300,000 newly issued shares, was then 817,500 shares. Norton was co-underwriter of the public offering, distributing 250,000 shares itself. The underwriting was made on a firm-commitment basis requiring Norton to buy the shares from Designcraft and resell them to the public, a process completed within a few days. At all material times Designcraft was registered pursuant to § 12(g) of the Securities Exchange Act of 1934. 15 U.S.C. § 78*l*(g), with the Securities and Exchange Commission as a company the shares of which are traded over-the-counter so that § 16(b) was applicable to Designcraft's common stock. There was no relevant connection between Norton and Designcraft before the underwriting transaction took place.

Perine contends that by buying and then selling within a few days more than 10% of Designcraft's outstanding common shares in the course of the underwriting, Norton became an insider of Designcraft and subject to suit for recovery of profits under § 16(b). That section allows recovery by the issuer of profits realized by insiders (officers, directors, or beneficial owners of more than 10% of the issuer's equity securities at the time of both purchase and sale) from the purchase and sale of any equity security of the issuer within any period of less than six months. As Norton was not an insider before undertaking the distribution, Perine relies principally on Stella v. Graham-Paige Motors, 232 F.2d 299 (2d Cir.), cert. denied, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956), which held that, upon making a purchase of securities which brings his holdings above the 10% level, the purchaser becomes an insider subject to liability under § 16(b).

Perine further argues that Norton is not exempted from § 16(b) liability by Rule 16b–2, which exempts purchases and sales made in connection with the distribution of a substantial block of securities, provided three specified conditions are met. It is claimed that the third condition (clause (a)(3)) of the rule was not met here.

Norton denies that § 16(b) is applicable to this underwriting transaction. It also contends that in these circumstances it is not in any event required to satisfy the third condition of Rule 16b–2 and that since it has satisfied both of the other conditions the distribution pursuant to the underwriting is exempted by that rule.

## DISCUSSION

Section 16(b) is a remedial statute designed to prevent a corporate insider from profiting through speculation in the stock of a publicly traded corporation with which he is connected by unfairly using information available to him as an insider. See Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972); Blau v. Max Factor & Co., 342 F.2d 304 (9th Cir. 1965); Adler v. Klawans, 267 F.2d 840 (2d Cir. 1959). Making administration of the statutory scheme simple, Congress adopted a prophylactic measure which permits recovery by the corporation of the profits from a class of insider transactions in which "the possibility of abuse was believed [by Congress] to be intolerably great", i. e., purchases and sales by an insider within six months, Reliance Electric Co. v. Emerson Electric Co., *supra*, 404 U.S. at 422, 92 S.Ct. at 599, "without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information", Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 595, 93 S.Ct. 1736, 1745, 36 L.Ed.2d 503 (1973).

As its first line of defense Norton contends that, in the conceded absence of a prior insider relationship between it and the issuer, § 16(b) does not apply to the underwriting in the present case, which was a traditional firm-commitment distribution of a substantial block of securities in which it acted as a mere conduit. Without the possibility of its having had prior access to inside information, it argues, the distribution did not present the

potential for abuse that is inherent in short-term transactions by insiders. See Kern County Land Co. v. Occidental Petroleum Corp., *supra,* 411 U.S. at 594–595.

Were it not for the plain language of § 16(b) and the established policy in favor of mechanical application of that language, see Reliance Electric Co. v. Emerson Electric Co., *supra,* Norton's argument might be persuasive. But § 16(b) provides in sweeping and unequivocal terms that "*any* profit realized by [such beneficial owner] from *any* purchase and sale . . . of *any* equity security of such issuer . . . within *any* period of less than six months . . shall . . . be recoverable by the issuer, irrespective of *any* intention on the part of such beneficial owner . . in entering into such transaction . . .." (emphasis supplied). In Stella v. Graham-Paige Motors, *supra,* for example, the purchaser's acquisition of more than 10% of the issuer's outstanding shares rendered it a "beneficial owner" within the meaning of § 16(a), subjecting it to liability under § 16(b) for profits upon a sale within six months.

Applying the plain language of the rule as thus interpreted, Norton became an insider when it purchased more than 10% of Designcraft's stock. It then sold the shares within the statutory six-month period. Thus there is a clearly sufficient basis for invoking § 16(b). See Newmark v. RKO General, Inc., 425 F.2d 348, 354–356 (2d Cir.), cert. denied, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970). Nothing by way of legislative history or other authority has been cited to support the view that the statute was not designed to apply to underwriting transactions at all. On the contrary, Congress appears to have assumed that the statute would have broad coverage by expressly authorizing the S.E.C., in anticipation that such a strict and categorical prohibition might work harsh results in certain situations, to adopt rules and regulations exempting from its oper-

ation any transactions which the S.E.C. might consider to be "not comprehended within the purpose of this subsection." Pursuant to this authority the S.E.C. has adopted Rule 16b–2 to exempt certain transactions. If Norton's distribution of Designcraft common stock as underwriter is to be excluded from the application of § 16(b), therefore, it must be by exemption under this rule rather than by a restrictive interpretation of the language of § 16(b) itself.

Rule 16b–2 exempts any transaction "which is effected in connection with the distribution of a substantial block of securities," provided three conditions are met: (1) that the underwriter be in the business of distributing securities and engaged in good faith in the distribution in question; (2) that the securities be acquired by the underwriter from or through the issuer with a view to distribution thereof; and (3) that

"Other persons not within the purview of section 16(b) of the Act are participating in the distribution of such block of securities on terms at least as favorable as those on which [the person seeking the exemption] is participating and to an extent at least equal to the aggregate participation of all persons exempted from the provisions of section 16(b) of the Act by this [rule]." [3]

Until the S.E.C., at the court's request, filed an amicus brief upon this appeal, raising a question as to Norton's compliance with the first of the above conditions (which we discuss below), Perine, not disputing Norton's satisfaction of the first two conditions, based its appeal solely upon Norton's failure to comply with the third (clause (a)(3)). Accordingly we turn first to the issue raised with respect to the third condition, which we have quoted above, since resolution of that issue in Perine's favor would be dispositive of the case.

There can be little question about the fact that, if clause (a)(3) of Rule 16b–2 applied to Norton's underwriting of Designcraft's securities issue, Norton would

---

**3.** 17 C.F.R. § 240.16b–2(a)(3) (1974).

not qualify for an exemption from § 16(b) liability for its underwriting profits. Assuming that pursuant to our holding in *Stella* Norton became an insider when it purchased more than 10% of Designcraft's common stock, Norton would be required, in order to obtain the exemption, to arrange for a group of noninsider underwriters collectively to distribute an equal percentage of Designcraft's securities on the same terms that it enjoyed (so that no one underwriter would handle more than 10% of Designcraft's outstanding common shares). Norton contends, however, that, while a literal reading of clause (a)(3) would appear to preclude its qualifying for an exemption, the clause was intended to apply only to an underwriter who was an insider of the issuer before the underwriting transaction. Under such an interpretation Norton would satisfy clause (a)(3), since there is no contention that it was in any way connected with Designcraft before the distribution.

The question, therefore, is whether we should confine ourselves to the literal language of Rule 16b–2(a)(3) or be guided by Learned Hand's observation that "it is commonplace that a literal interpretation of the words of a statute is not always a safe guide to its meaning," Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960). We prefer to look behind the language of the rule to the drafter's purpose. "There is no surer guide in the interpretation of a statute than its purpose when that is sufficiently disclosed; nor any surer mark of over solicitude for the letter than to wince at carrying out that purpose because the words used do not formally quite match with it." Federal Deposit Ins. Corp. v. Tremaine, 133 F.2d 827, 830 (2d Cir. 1943) (L. Hand, C. J.).

In order to understand the full meaning of the third clause of the rule, it is necessary to examine its antecedents. The rule was originally promulgated by the S.E.C. in 1935 as Rule NB2. At that time the third condition of the rule provided:

"If the person effecting such transaction is either (1) an officer or director of the issuer, (2) a firm of which such officer or director is a partner, or (3) a corporation or other person in respect of which such officer or director is an officer, director or beneficial owner, directly or indirectly, of more than 10 per cent of any class of equity security, then other persons who are not specified in clauses (1), (2) or (3), of this paragraph (c) must have participated in the purchase of such security (or other securities of the same issue) with a view to the distribution thereof, on terms identical with those on which such specified persons have participated and to an extent at least equal to the aggregate participation of all such specified persons." [4]

Since the phrasing of the paragraph was conditional, only persons specified in (1), (2) or (3) were required to meet the equal-participation requirement, i. e., those who were preexisting insiders at the time of the underwriting. A person whose insider status arose solely from the underwriting itself, i. e., from his distribution of more than 10% of the issuer's securities, was not required to fulfill the sharing provisions of the rule and thus received the exemption if he satisfied only the first two conditions thereof. This formulation was retained in all amendments of the rule made until 1952.[5] Thus until the 1952 amendments an underwriter that distributed more than 10% (or any amount) of the outstanding securities of the issuer was not required to satisfy the third condition unless he was an officer or director of the issuer or a partnership or corporation affiliated or connected with an officer or director of the issuer.

---

4. Securities Exchange Act Release No. 535 (Class A) (1936).

5. See *id.;* Securities Exchange Act Release No. 1080 (1937); Securities Exchange Act Release No. 3907 (1947).

In 1952 the rule was amended again in several respects,[6] the only change relevant here being in clause (a)(3). At that time the conditional language of the third section was eliminated and replaced by the simpler language found in that section as it now stands (quoted above on page 8), which, literally read, appears to impose a blanket requirement upon all underwriters regardless of their pre-underwriting status. Unfortunately none of the press releases connected with the 1952 amendments mention or explain the change in the wording of the third condition.[7] Naturally enough, Perine argues that the 1952 amendment was designed to work a substantive change in the rule, whereas Norton urges with equal fervor that it was merely intended to simplify the language without changing the content. Both point to different portions of earlier versions of the rule and to statements by the S.E.C. from time to time, as indications that the history and evolution of the rule lend support to their respective positions.

Were we left without further light on the subject we might, because of ambiguities and past apparently contradictory statements by the S.E.C. regarding the rule, conclude that the background is too unclear to assist us to decide whether a substantive change was intended, forcing us to rely solely upon the plain meaning of the amended language. However, we fortunately have the benefit of the views of the S.E.C., the author of the 1952 change, as to its purpose. In an amicus brief filed at the court's request the Commission states:

"[W]e believe that the 1952 amendment to clause (a)(3) was not intended to have the substantive effect of changing the scope of that clause. Rather, it apparently was intended to simplify the rather cumbersome language of the previous formulation of clause (a)(3). For if the Commission had intended to affect the meaning of clause (a)(3), that intention would presumably have been reflected in the accompanying releases."

The interpretation of a regulation or statute by a regulatory agency that is charged with administering it is given considerable deference by federal courts, see Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945), so long as it is not clearly unnatural or unreasonable. Such deference is usually justified on the basis of the agency's superior expertise in the area of its authority. See, e. g., Allen M. Campbell Co. General Contractors, Inc. v. Lloyd Wood Construction Co., 446 F.2d 261, 265 (5th Cir. 1971). In this case we are persuaded that the Commission's interpretation of its regulation and of the 1952 amendments thereto, although informal, should be given considerable weight. The S.E.C. is charged with supervising the enforcement and application of the nation's federal securities laws, e. g., 15 U.S.C. §§ 77s, 78u and 78w, and is thus uniquely suited to determine what interpretation of its rule best effectuates the purposes of § 16(b) and of the other securities statutes.

As the S.E.C. notes, there are sound policy reasons for holding that the 1952 amendment did not make a substantive change in clause (a)(3). That clause is designed to prevent insider underwriters from obtaining an unfair advantage over others or a preferential position in a distribution by virtue of their inside position.[8] Unlike the pre-existing insider, an unrelated underwriter is not

---

**6.** See Securities Exchange Act Release No. 4754 (1952).

**7.** See *id.;* Securities Exchange Act Release No. 4719 (1952) (proposed amendment).

**8.** See Securities Exchange Act Release No. 3907 (1947).

in a position to use his inside position in trading activities before the distribution or to obtain a preferential position in the underwriting. Other provisions of the securities laws provide adequate protection against the underwriter's misuse of information obtained as a result of the underwriting relationship itself. See In the Matter of Investors Management Co., Inc., Securities Exchange Act Release No. 9267 (1971).

For these reasons we conclude that an underwriter who purchases and sells more than 10% of an issuer's shares in the course of a firm-commitment underwriting, and who is not otherwise an insider of the issuer under § 16(b), is not required to satisfy the condition of clause (a)(3) of Rule 16b–2 in order to qualify for an exemption from § 16(b) liability under that rule.

Were the record limited to that before the district court we would affirm its order without qualification. However, our attention has been called by Perine and the S.E.C. to the latter's institution on April 2, 1974, of an administrative proceeding, presently pending, in which the S.E.C. has alleged that Norton used the Designcraft underwriting as a vehicle for manipulating Designcraft stock. See In the Matter of William Norton & Company, Inc., Adm. Proceeding File No. 3–4466. In view of Perine's allegation, made for the first time on this appeal, that that proceeding will establish that Norton did not participate in the Designcraft underwriting in good faith as required by clause (a)(1) of Rule 16b–2, and the S.E.C.'s statement that the administrative proceeding is based on charges that Norton did not participate in good faith, we remand the case to the district court for the purpose of resolving the question of whether the distribution in question was precluded from exemption by reason of Norton's noncompliance with clause (a)(1) of Rule 16b–2. Our remand, of course, does not imply any views on our part regarding the merits of the allegations of noncompliance.