**BUNKER RAMO–ELTRA CORP., et al., Plaintiffs,**

v.

**FAIRCHILD INDUSTRIES, INC., et al., Defendants.**

Civ. A. No. HAR 84–2676.

United States District Court, D. Maryland.

June 19, 1986.

Noel C. Crowley, and Allied-Signal, Inc., Morristown, N.J., for plaintiffs.

James Schropp, and Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., for defendants.

## MEMORANDUM OPINION

HARGROVE, District Judge.

Plaintiffs, Allied Corporation and Bunker Ramo-Eltra Corporation, the successor to Bunker Ramo and a wholly owned subsidiary of Allied Corporation (hereinafter referred to as "Bunker Ramo-Eltra") originally filed this lawsuit in the United States District Court for the Southern District of New York on May 9, 1983, against defendants, Fairchild Industries (hereinafter referred to as "Fairchild") and its wholly owned subsidiary Fairchild Industries of Delaware (hereinafter referred to as "FIDEL") to recover "short-swing" insider profits allegedly realized by the defendants in violation of Section 16(b) of the Securities and Exchange Act of 1934 (hereinafter referred to as "Exchange Act"), 15 U.S.C. § 78p(b) (1964). This section provides:

(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized...

The defendants answered the complaint and filed a counterclaim on July 6, 1983. In their answer, defendants raised the following defenses: failure to state a claim; plaintiffs' lack of standing under section 16(b); improper venue; waiver; and estoppel.

The counterclaim is an action based on the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. The defendants allege in the counterclaim that they are entitled to recover from plaintiff Allied all costs, damages, liabilities, losses and expenses which might result from Counts I and II of the complaint by virtue of an indemnification agreement between Allied and Fairchild and FIDEL.

The district courts of the United States have exclusive jurisdiction of violations of the Exchange Act under Section 27 of the Exchange Act, 15 U.S.C. § 78aa (1964).

Venue for violations of the Exchange Act is governed by Section 27 of the Exchange Act, 15 U.S.C. § 78aa (1964) which provides in pertinent part that:

[a]ny suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an in-

habitant or wherever the defendant may be found.

After the defendants filed a Motion to Dismiss for Improper Venue, or in the Alternative, to Transfer, to which the plaintiffs responded, the Honorable Mary Johnson Lowe of the United States District Court for the Southern District of New York, found that venue was proper in Maryland and New York, and transferred this case in accordance with the doctrine of *forum non conveniens* based on 28 U.S.C. § 1404(a) to the District of Maryland on June 6, 1984.

Before the transfer, the parties had filed cross motions for summary judgment and pre-trial memoranda including a 35–page Joint Stipulation of Facts. After the transfer, both parties filed respective Motions for Summary Judgment and opposition thereto. The court held a hearing on these motions on May 2, 1986.

### STIPULATED FACTS [1]

From on or about May 7, 1981, through on or about July 31, 1981, Allied Acquisition Corporation ("Allied Acquisition") was a wholly-owned subsidiary of Allied, and was a corporation incorporated under the laws of the State of Delaware. Allied Acquisition was formed for the purpose of acquiring all of the common stock of Old Bunker Ramo and [thereby] effecting a merger with Old Bunker Ramo. On or about July 31, 1981, Old Bunker Ramo was merged into Allied Acquisition. Allied Acquisition survived the merger and changed its name to Bunker Ramo Corporation (hereinafter referred to as "New Bunker Ramo"). New Bunker Ramo was a wholly-owned subsidiary of Allied. On or about June 1, 1982, Eltra Corporation, then a wholly-owned subsidiary of Allied, was merged into New Bunker Ramo. New Bunker Ramo survived the merger, and changed its name to Bunker Ramo-Eltra. Although it is a named plaintiff in this

proceeding, Bunker Ramo-Eltra merged on January 16, 1986, with Allied as noted above.[2]

In the fall of 1978, and for a period of time prior thereto, Martin Marietta Corporation ("Martin Marietta") owned 1,166,667 shares of common stock of Old Bunker Ramo (the "Martin Marietta Shares"). The Martin Marietta Shares represented approximately 21% of the outstanding voting stock of Old Bunker Ramo in 1978. At that time, two representatives of Martin Marietta served as directors on the Board of Directors of Old Bunker Ramo. In the fall of 1978, Martin Marietta proposed to sell the Martin Marietta Shares to United States Filter Corporation ("U.S. Filter"). At a Special Meeting of the Board of Directors of Old Bunker Ramo, held on October 10, 1978, the Board of Directors of Old Bunker Ramo authorized the issuance of a letter of serious and irreparable damage to Old Bunker Ramo, and also authorized the institution of legal action to oppose said proposed sale "in the event Martin Marietta Corporation does not respond in a satisfactory manner." Following the issuance of the above-mentioned letter, U.S. Filter subsequently terminated its plan to purchase the Martin Marietta Shares.

Defendant Fairchild resolved to seek a business combination between itself and Old Bunker Ramo, a public corporation listed on the New York Stock Exchange. It was apparently in furtherance of this objective that Fairchild, acting through a subsidiary (the defendant FIDEL) which it formed for the purpose [of purchasing Old Bunker Ramo stock], on February 20, 1979 purchased from another company 1,666,667 shares of Old Bunker Ramo stock, amounting to slightly less than 21% of Old Bunker Ramo's outstanding shares. At that time and at all other relevant times, Fairchild's chairman and chief executive officer, Ed-

---

**1.** The court is not making any determination of facts in this case but is relying instead on the Joint Stipulation of Facts submitted by the parties as listed in this section. Since there is no

dispute as to material facts, this case is in proper form for resolution by summary judgment.

**2.** The plaintiffs shall be referred to as plaintiff or Allied in the remainder of this opinion.

ward G. Uhl, served on Old Bunker Ramo's board of directors.[3]

The management of Old Bunker Ramo, anticipating a hostile takeover by Fairchild and intending to prevent the same, sought and obtained from Fairchild a written pledge by means of a "Standstill Agreement" dated January 5, 1979 which, subject to certain exceptions, bound Fairchild not to acquire in excess of 21% of Old Bunker Ramo's stock during a 3–year period without Old Bunker Ramo's consent. This agreement also provided that Fairchild, subject to certain exceptions, would not sell the block it had acquired to a single entity. The agreement further provided that Old Bunker Ramo would not merge with another company without affording Fairchild the opportunity to make its own takeover proposal.

On May 18, 1979, Fairchild offered to buy an additional 27% of the total Old Bunker Ramo stock as part of a formal merger proposal. The proposal was rejected by the Old Bunker Ramo board. On September 25, 1979, Fairchild expressed its interest in buying all of Old Bunker Ramo's shares for cash, but did not specify a price. On October 3, 1979, Fairchild offered to buy 1,700,000 additional shares at $33 per share, again expressing its desire to bring about a business combination. This offer was rejected.

In preparing for the annual meeting of stockholders held on April 22, 1980, Old Bunker Ramo sought from Mr. Uhl a commitment to put the interests of Old Bunker Ramo ahead of the interests of Fairchild as regards any conflict between them. When Mr. Uhl refused, his name was deleted from the slate of directors sponsored by management. Mr. Uhl and another Fairchild director, Thomas H. Moorer, were nevertheless nominated and elected by reason of the votes cast by Fairchild under the company's cumulative voting procedures.

Old Bunker Ramo thereafter held discussions concerning mergers with several other companies, including Allied. Discussions with Allied started in the summer of 1980.

Between February 10, 1981 and February 17, 1981, FIDEL made five separate purchases of Old Bunker Ramo common stock on the New York Stock Exchange, buying a total of 10,000 shares for which it paid a total of $387,887.50 and a broker's commission of $2,000. On or about March 10, 1981 FIDEL filed a "Form 4" with the Securities and Exchange Commission reflecting the purchase of the 10,000 shares of Old Bunker Ramo common stock in February 1981. Drafts of proxy statements prepared by Old Bunker Ramo recite the total of Fairchild stockholdings, using a figure (1,275,167 shares) which reflects the addition of most of the February, 1981 stock purchases.

A formal merger agreement, made subject to approval by the Old Bunker Ramo board of directors, was executed by Allied and Old Bunker Ramo on May 11, 1981 under which Allied agreed to make a tender offer of $55 per share for up to 1,175,000 shares of Bunker Ramo stock, and to merge Old Bunker Ramo with an Allied subsidiary if the tender offer was successful. This offer also reserved to Allied the right to buy an additional 434,000 shares of stock. Immediately following the execution of this agreement, written permission was given by Old Bunker Ramo to Fairchild to sell FIDEL's Old Bunker Ramo shares to Allied, whose permission was required by the Standstill Agreement referred to above. Allied and Fairchild thereupon executed an agreement dated May 11, 1981 (the "Stock Purchase Agreement") under which Allied agreed to buy and Fairchild and FIDEL agreed to sell all of FIDEL's shareholdings, which then amounted to 1,276,667 shares, the amount recited in the agreement. The purchase price was $55 per share, making a total purchase price of $70,316,685 with payment made by means of a note in that amount

---

3. Plaintiff uses this fact in its Motion for Summary Judgment to support their contention that defendants possessed insider information since

Mr. Uhl was a member of Old Bunker Ramo's board of directors.

bearing interest at the greater of 12¾ per annum or "the Prime Lending Rate" and due on January 2, 1985. The stock certificates were delivered and the note was signed on June 15, 1981. The Stock Purchase Agreement contains an indemnification clause which provides the following:

12. Indemnification

(a) Allied shall indemnify and hold harmless Fairchild and Fairchild Delaware, their directors, officers, [for any] losses and expenses whatsoever suffered or incurred by any of the foregoing indemnified parties in connection with any claim or litigation commenced or threatened by Bunker Ramo or any shareholder of Bunker Ramo that arises out of or is based upon the execution, delivery and consummation of this Memorandum of Agreement and the transaction contemplated thereby, *provided, however*, that Allied shall not be liable to any of the foregoing indemnified parties on account of any settlement of any claim or litigation to which this indemnity relates effected without the consent of Allied, which consent shall not unreasonably withheld, and *provided further*, that Allied shall provide no indemnification hereunder with respect to any conduct or actions of Fairchild or Fairchild Delaware *prior* to the date hereof. (Emphasis added)

(b) Promptly after receipt by a party indemnified under this paragraph 12 of notice of the threat or commencement of any claim or litigation such indemnified party will, if a request for indemnification in respect thereof is to be made against Allied under this Paragraph 12, notify Allied in writing of such claim or litigation. Failure of an indemnified party so to notify Allied will relieve Allied from any obligation to indemnify such indemnified party under this Paragraph 12. In case any such claim or litigation is threatened or commenced against any indemnified party, and it so notifies Allied of such claim or litigation, Allied shall be entitled to participate in the defense thereof and, upon written notice to such indemnified party, to assume the defense thereof at Allied's expense with counsel chosen by Allied, which counsel shall have no conflict of interest with any indemnified party. Upon receipt of notice by such indemnified party from Allied of its election so to assume the defense of such claim or litigation, Allied will cease to be liable to such indemnified party under this Paragraph 12 for any fees and expenses of any counsel retained by such indemnified party or any expenses incurred in investigating, preparing or defending against such claim or litigation thereafter suffered or incurred by such indemnified party; *provided, however*, that notwithstanding Allied's election to assume the defense of such claim or litigation, such indemnified party shall have the right to employ separate counsel and to participate in the defense of such claim or litigation, all at its own expense.

c. This provision on indemnification shall survive the Closing or any termination under Paragraph 13 hereof.

(Appendix 3 to the Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment)

Allied's tender offer was not announced to the public until May 13, 1981. The tender offer was successful, and the merger between Old Bunker Ramo and Allied's subsidiary was approved by the shareholders of Old Bunker Ramo and effected on July 31, 1981.

## DISCUSSION

The plaintiff is suing to recover the "short-swing" insider profits which they allege resulted from the purchase by FIDEL of the 10,000 shares of Old Bunker Ramo common stock from February 10, 1981 to February 17, 1981, at a price per share ranging from $38.50 to $39.50 and the subsequent sale by FIDEL to Allied of 1,276,667 shares, including the 10,000 in question, of Old Bunker Ramo common stock on May 11, 1981 for $55 per share. The purchase and sale of the stock did take

place within six months, within the prohibited statutory time period established by section 16(b).

The plaintiff alleges that the defendants were insiders who bought and sold the shares within six months and thus, according to Section 16(b) of the Exchange Act, the plaintiff as "issuer" is entitled to recover the defendants' profits resulting from the purchase and sale of these 10,000 shares.

The defendants raise five major issues in their motion for summary judgment as follows: 1) the plaintiff's alleged lack of standing; 2) the equitable principles surrounding Section 16(b) of the Exchange Act; 3) whether this sale and purchase of these securities was an "unorthodox transaction", and thus an exception to strict liability under section 16(b); 4) the question of whether the defendants were insiders who had insider information; and 5) whether the indemnification clause in the Stock Purchase Agreement entitles the defendants to be indemnified by Allied for any claims arising out of this lawsuit.

The plaintiff and the defendants assert that there is no genuine issue as to any material fact and that one party is entitled to judgment as a matter of law, pursuant to Rule 56 of the Federal Rules of Civil Procedure. "Since its impact is rather drastic, a summary judgment must be used with due regard for its purposes and should be cautiously invoked so that no person will be improperly deprived of a trial of the disputed factual issues." *Watson v. Southern Railway Co.*, 420 F.Supp. 483, 486 n. 4, (1975), *aff'd.* 542 F.2d 1170 (4th Cir.1976). In this case, however, the Court finds that there is no dispute of material fact and that the plaintiff is entitled to judgment as a matter of law.

## STANDING ISSUE

Defendants' argument that the plaintiff does not have standing to sue under section 16(b) is without merit. Section 16(b) clearly states that:

Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction *by the issuer, or by the owner of any security of the issuer* in the name and in behalf of the issuer...

15 U.S.C. § 78p(b) (Emphasis supplied)

The original issuer of the securities involved in this case was Old Bunker Ramo, a corporation which ceased to exist as of July 31, 1981. Bunker Ramo-Eltra, a Delaware corporation, is the successor by merger to the issuer. Delaware law in 8 Del.C. § 259 provides that when there is a merger, any causes of action which might have existed pass by operation of law to the surviving company. *See Heit v. Tenneco, Inc.*, 319 F.Supp. 884 (D.C.Del.1970). Thus, plaintiff Bunker Ramo-Eltra could generally assert any cause of action that Old Bunker Ramo could have asserted. Bunker Ramo-Eltra is a plaintiff in this case who merged with plaintiff Allied who also is a successor corporation who can assert any claim that Old Bunker Ramo could have asserted.

Most of the section 16(b) violation cases involving hostile takeover situations, were brought by or on behalf of the successor by merger to the original issuer. *See Kern County Land Co. v. Occidental Petroleum*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973); *Heublein, Inc. v. General Cinema Corp.*, 722 F.2d 29 (2d Cir.1983), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1416, 79 L.Ed.2d 742 (1984); *Colan v. Prudential-Bache Securities, Inc.*, 577 F.Supp. 1074 (N.D.Ill.1983).

In respect to claims for recovery under section 16(b), the majority of courts have held that an issuer corporation's cause of action survives after a corporation is extinguished by merger and that the surviving and successor corporation is vested with the right to initiate a section 16(b) action. In *Lewis v. McAdam*, 762 F.2d 800 (9th Cir.1985), the court addressed the question of whether an issuer corporation's cause of action against one of its directors for violation of section 16(b) survives after the original issuing corporation is extinguished by merger. The court held that:

"SDC, as the surviving corporation, was vested with the rights [of the original corporation] to initiate a section 16(b) action against a director of Coldwell Banker as a matter of law". *Id.* at 803.

█ In this case the plaintiff corporation is the successor by merger of the original issuer corporation, Old Bunker Ramo. *Supra*, (See p. 412 and 413 of this opinion). Thus, the plaintiff has standing to bring this suit.

## EQUITABLE PRINCIPLES UNDER SECTION 16(b)

Defendants argue that section 16(b) is "a unique statutory cause of action which looks to both the legal and equitable jurisdiction of federal courts" and that because Old Bunker Ramo had actual knowledge that the shares sold to Allied had been purchased within the previous six months, it is unfair to allow plaintiffs to recover profits under section 16(b). They contend that: "to permit this section 16(b) suit to proceed will unjustly enrich parties never intended to be the beneficiary of the statute. Courts have long disapproved of claims that misuse section 16(b) in an attempt to obtain a windfall".

Defendants also argue that no interest of the minority shareholders of Old Bunker Ramo, the intended beneficiaries of the protection provided by section 16(b), will be served by permitting Allied to recover the profits realized by the defendants in this suit.

None of the defendants' arguments are persuasive. The defendants argue that since the plaintiff was a successor corporation to the original issuer of the stock in question as well as being the purchaser of the stock, the plaintiff should be barred from bringing suit. They further argue that plaintiff should have known that Allied's purchase of the stock was within the proscribed six-month time period and thus the plaintiff was aware that the defendants were violating the provisions of section 16(b).

In the case of *Roth v. Fund of Funds*, 405 F.2d 421 (2nd Cir.1968), *cert. denied*, 394 U.S. 975, 89 S.Ct. 1469, 22 L.Ed.2d 754 (1969), *reh'g denied*, 395 U.S. 941, 89 S.Ct. 1994, 23 L.Ed.2d 459 (1969), a sale which yielded a short-swing profit was made directly to the issuing corporation. The court denied that this created a barrier to section 16(b) recovery and stated that "the statute makes no exception where the transaction giving rise to the profit occurred at the incentive of the issuer, and we are not disposed to create one." *Id.* at 422–23. Thus, the fact that plaintiff is the purchaser as well as the successor to the issuing corporation of the securities in this case does not bar it from bringing suit.

Congress enacted Section 16(b) of the Exchange Act for several purposes, one of which was to compensate the issuing corporation for losses it suffered from actual insider abuse. Another deterrent purpose of the statute is:

"[to] curb the evils of insider trading [by] ... taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Electric Co., v. Emerson Electric Co.*, 404 U.S. 418 at 422 [92 S.Ct. 596 at 599, 30 L.Ed.2d 575] (1972). *reh'g denied* 405 U.S. 969 [92 S.Ct. 1162, 31 L.Ed.2d 244] (1972). [Congress] accomplished this by defining directors, officers, and beneficial owners as those presumed to have access to inside information and enacting a flat rule that a corporation could recover the profits these insiders made on a pair of security transactions within six months.

*Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 244, 96 S.Ct. 508, 516, 46 L.Ed.2d 464 (1976).

Section 16(b) uses an objective standard to impose strict liability upon most of the transactions [4] which occur with the six-month time period to stop the evils of insider trading. As the court in *Bershad v.*

---

**4.** A discussion of possible exceptions to the strict liability imposed by section 16(b), including unorthodox transactions will be discussed later.

*McDonough,* 428 F.2d 693, 696 (7th Cir. 1970), *cert. denied,* 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971) said:

> In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect.

■ Since one of the statute's objectives is to prevent questionable transactions by insiders to the detriment of minority or outside shareholders, courts have held that the equitable defenses of waiver and estoppel are generally insufficient defenses as a matter of law to section 16(b) actions. *See Texas International Airlines v. National Airlines, Inc.,* 714 F.2d 533, 536 (5th Cir. 1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 721 (1984). *Roth,* 405 F.2d at 422–423, *Magida v. Continental Can Co.,* 231 F.2d 843, 846 (2d Cir.1956), *cert. denied,* 351 U.S. 972, 76 S.Ct. 1031, 100 L.Ed. 1490 (1956). This Court is not disposed to grant an exception to the disallowance of equitable defenses of section 16(b) cases in this case since the plaintiff's actions are not egregious enough for the court to thwart the remedial purpose of the statute.

## UNORTHODOX TRANSACTIONS

There is an exception to the strict liability requirement in section 16(b) if the sale and purchase constitute an "unorthodox transaction". The defendants contend that "the sale of the securities to Allied was an "unorthodox transaction". The plaintiff disagrees. Both parties rely upon the primary case dealing with unorthodox transactions which is *Kern County Land Co. v. Occidental Corp.,* 411 U.S. 582, 93 S.Ct. 1736. In *Kern County,* Occidental Petroleum Corporation, a shareholder in the Kern County Land Company (KCLC), converted its shares in KCLC into shares of the acquiring corporation pursuant to a merger. The Supreme Court distinguished the conversion of securities by Occidental from a traditional cash-for-stock transaction since the cash-for-stock transactions are clearly within the purview of section 16(b). The Supreme Court stated that "stock conversions, exchanges pursuant to mergers and other corporate reorganizations, and dealings in options, rights, and warrants" [may be considered unorthodox transactions]. *Kern County,* 411 U.S. at 593, n. 24, 93 S.Ct. at 1744, n. 24.

The Supreme Court found in *Kern County* that Occidental's involuntary exchange of stock pursuant to a merger was an unorthodox transaction. The court stated that once a sale and purchase of stock is determined to be an unorthodox transaction, then the question of whether there is actual insider information and resulting insider abuse should be considered.

Defendants' reliance upon *Gold v. Sloan,* 486 F.2d 340 (4th Cir.1973), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974), to show that the transaction in this case was an unorthodox transaction is misplaced since in *Gold,* there was an exchange of stock pursuant to a merger not a cash transaction as in this case. The Court found in *Kern County* that there was no possibility of speculative abuse of inside information by Occidental. Based on those two findings, the Court then held that section 16(b) did not apply to the Occidental exchange.

■ In this case, there was no involuntary exchange of stock pursuant to a merger. Fairchild and FIDEL had a cash-for-stock transaction even though a promissory note was involved in the purchase agreement. The defendants elected to sell their shares within a six month period. Therefore, this Court finds that the cash sale of the subject shares to Allied was not an "unorthodox transaction."

## INSIDER INFORMATION

A corporate insider is defined in the Act as any "person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of an equity security ... or who is a director or an officer of the issuer...." 15 U.S.C. § 78p(a). In this case, defendants are clearly insiders since they held almost 21% of Old Bunker Ramo's total shares during the time period involved with the short-swing transaction. Defendants claim that they lacked actual insider information due to "the unremitting hostility and antagonism between Fairchild and Old Bunker Ramo in general, and defendants' complete lack of knowledge of or participation in the merger negotiations in particular." As the preceding section noted, the lack of actual insider knowledge and the resulting lack of actual insider abuse is only relevant in those section 16(b) claims that involve unorthodox transactions. The Supreme Court in *Kern County* stated that *only* in unorthodox transactions did the issue of insider abuse arise since a "cash-for-stock transaction results in automatic section 16(b) liability". *Texas International Airlines v. National Airlines, Inc.*, 714 F.2d at 540 n. 10. The statute itself, states that any profit realized from any purchase and sale within any period of less than six months shall inure to and be recoverable by the issuer, *irrespective of any intention* on the part of the seller entering into such [a] transaction. 15 U.S.C. § 78p(b) (Emphasis added).

The court finds that in this case defendants were clearly insiders and within the purview of section 16(b).

## INDEMNIFICATION

The defendants' final argument is that if they are liable under section 16(b), they are entitled to be indemnified by Allied pursuant to the indemnification agreement, paragraph 12 of the Stock Purchase Agreement. *Supra*, at p. 414. They allege that since the section 16(b) claim at issue in this suit is one that "arises out of... the [Stock Purchase Agreement] and the transaction contemplated thereby; *i.e.*, the transfer of the FIDEL agreement", the indemnification clause should apply to this litigation. To support this contention, they argue that Allied agreed to the indemnification clause with full knowledge of its purpose and meaning and that such "prudent business judgment does not offend public policy". Defendants cite *Batchkowsky v. Penn Central Company*, 525 F.2d 1121, 1124 (2d Cir.1975) and *Cormier v. Rowan Drilling Co.*, 549 F.2d 963, 970 (5th Cir.1977) to support their claim. Both of these cases are factually distinguishable from the instant case. In *Batchkowsky* the indemnification agreement provided for broad indemnification of the defendant railroad by the third-party defendant, Anheuser-Busch, Inc. with respect to any injuries resulting from Anheuser-Busch's construction of a loading platform. In *Cormier* the purpose of the indemnity provisions in a contract between an oil company and a drilling contractor was to guarantee that each employer was responsible for any injuries to their employees. Both of these indemnification provisions were in accordance with the custom of the construction trade and did not violate any public policy.

In contrast, the defendants in this case are trying to retain profits which resulted from their improper actions which did violate section 16(a) as well as the public policy underlying that section of the Exchange Act.

Section 29(a) of the Exchange Act, 15 U.S.C. § 78cc(a) contains an anti-waiver provision as follows:

### Waiver Provisions

(a) Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.

Contract Provisions in Violation of Chapter

(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) hereto-

fore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule or regulation.

If this indemnification is found to be valid, then the defendants would have been able to waive, in effect, the requirement of section 16(b) since they would not have to return the short-swing profits back to the plaintiff issuer. This result would frustrate the public policy behind the prohibition of insider trading within the six-month time period found in section 16(b).

There is another argument advanced by the plaintiff that the indemnity agreement does not cover the subject claim. By its terms, the coverage is limited to any claim "that arises out of or is based upon the execution, delivery and consummation of this Memorandum of Agreement and the transaction contemplated thereby", meaning the sale of the shares from defendants to Allied. This is followed by a specific exclusion: "Allied shall provide no indemnification hereunder with respect to any conduct or action of defendants prior to the date hereof" or May 11, 1981.

Indemnification, therefore, is strictly limited to liability arising from the sale of the shares, or the agreement to sell them. But the claim here in question, like all section 16(b) claims, is based not only upon the sale but also upon the purchase of the shares within the requisite time span, since both are necessary to effect a short-swing transaction prohibited by section 16(b). The court in *Peyser v. Meehan Fund, Inc.*, 264 F.Supp. 1 (S.D.N.Y.1966), while discussing the question of venue which should be applied in section 16(b) cases stated that:

> A purchase of stock or sale of stock is, in itself, an innocent transaction. It is only when both a purchase and a sale occur within the proscribed period that the statute is violated.

264 F.Supp. at 3.

The court finds that the indemnification agreement does not apply to the defendants' purchase and sale of the 10,000 shares involved in this case since the purchase of the shares occurred prior to the May 11, 1981 effective date of the indemnification agreement. Further, the court finds that enforcement of the indemnification agreement would be in violation of public policy. Thus, the defendants' counterclaim concerning the indemnification is dismissed.

## CONCLUSION

The plaintiff as a successor corporation to Old Bunker Ramo has properly filed this suit against the defendants to recover "short-swing" insider profits resulting from the purchase of 10,000 shares of Old Bunker Ramo stock during February, 1981 and their subsequent sale in May, 1981. The defendants are insiders as defined by the act since they owned more than 10% of the Old Bunker Ramo total shares during the time period of February to May, 1981. The sale of the securities to Allied was a cash-for-stock transaction and could not be considered an unorthodox transaction as defined in the *Kern County* case. Thus, the defendants' sale and purchase of these securities within the proscribed six-month time period did violate Section 16(b) of the Exchange Act and the indemnification agreement does not apply. Accordingly, the plaintiff's Motion for Summary Judgment is granted and the defendants' counterclaim based on the indemnification is dismissed.

## DAMAGES

The defendants' short-swing profits realized by their violation of section 16(b) consist only of the difference between

the original purchase price paid by the defendants including the commission ($389,-887.50) and the purchase price of $550,000 paid by Allied to defendants or $160,112.50, plus the interest only on the sum of $160,-112.50 paid by the plaintiff in accordance with the promissory note. The plaintiff states in its Motion for Summary Judgment that defendants received a total of $280,-274.00 in interest on that portion of the note which is attributable to the short-swing shares, giving them a total profit of $442,386.50 on the short-swing transaction as of January 2, 1985, when the note was paid. This amount of interest seems excessive so it is ordered that counsel for the plaintiff submit the amount of interest paid to the defendants with evidence to support the amount.

The plaintiff also requests an award for prejudgment interest at 7.87% from January 2, 1985, which by May 1, 1986 will exceed $46,000.

Prejudgment interest and its award is within the discretion of the court. *See Fox v. Kane-Miller Corp.*, 398 F.Supp. 609 (1975), *aff'd*, 542 F.2d 915 (4th Cir.1976). In this case the court declines to award prejudgment interest since there is no showing of fraud or blatant misconduct by the defendants.