[No. 59661-6-I.   Division One.   January 14, 2008.]

NAVEEN JAIN ET AL., *Appellants*, v. J.P. MORGAN SECURITIES, INC., ET AL., *Respondents*.

576

*Arthur W. Harrigan, Jr., Timothy G. Leyh, Katherine S. Kennedy*, and *Randall T. Thomsen* (of *Danielson Harrigan Leyh & Tollefson, LLP*); *Larry S. Gangnes, John R. Neeleman*, and *Theodore A. Sheffield* (of *Lane Powell, PC*); and *Robert B. Gould*, for appellants.

*Brian C. Free* and *Michael R. Scott* (of *Hillis Clark Martin & Peterson, PS*) (*John D. Pernick* and *David M. Balabanian* of *Bingham McCutcheon, LLP*, of counsel), for respondent J.P. Morgan Securities, Inc.

*Gregory J. Hollon, Barbara H. Schuknecht,* and *Robert M. Sulkin* (of *McNaul Ebel Nawrot & Helgren*), for respondent Wilson Sonsini Goodrich & Rosati, PC.

*Bradley S. Keller* and *Keith D. Petrak* (of *Byrnes & Keller, LLP*) and *Howard M. Goodfriend* (of *Edwards Sieh Smith & Goodfriend, PS*), for respondent Perkins Coie, LLP.

¶1 BAKER, J. — Naveen and Anuradha Jain were found by a federal district court to have violated section 16(b) of The Securities Exchange Act of 1934.[1] The case was settled pending appeal. The Jains then brought state tort claims against a brokerage and two law firms involved in the securities case. The superior court dismissed those claims, finding that they constituted de facto indemnity claims barred under federal securities law. We affirm.

I

¶2 Naveen Jain founded InfoSpace, Inc., in 1996 and served as an officer and director of the company until 2002. In 1998, InfoSpace went public and sold five million shares of common stock. The lead underwriter of the initial public offering (IPO) was Hambrecht and Quist (subsequently acquired by respondent J.P. Morgan Securities, Inc.). InfoSpace was represented by respondent Perkins Coie,

---

[1] Codified at 15 U.S.C. § 78p(b).

LLP. Respondent Wilson Sonsini Goodrich & Rosati, PC, served as Morgan's counsel.

¶3 For the benefit of their children, Jain and his wife Anuradha established three trusts for which Jain's brother served as trustee. Two of the trusts were initially funded with two million shares of InfoSpace stock, and the third purchased one million shares of InfoSpace stock from the Jains.

¶4 As InfoSpace was preparing for its IPO in late 1998, Jain executed an indemnification agreement with InfoSpace, agreeing to place one million shares of InfoSpace stock into an escrow account. Jain signed a registration statement and prospectus sent to the Securities and Exchange Commission (SEC). The prospectus included a footnote disclosing the indemnity agreement, stating that Jain had placed one million shares held by one of the trusts into escrow and indicating that Jain retained voting control over the shares. According to the Jains, no escrow account was ever actually created. Nevertheless, over the next year, Jain signed, or authorized his attorney to sign, numerous SEC filings representing that he had placed the trust shares in escrow.

¶5 In 1999, InfoSpace stock split two-for-one and Jain, like other shareholders, was issued new share certificates. Two of the trusts were entitled to nearly one million shares, and the third to 500,000 shares. After the Jains mistakenly sent the trust shares to Morgan, Morgan deposited them into the Jains' personal account. The alleged misdeposits into the Jains' personal account were subsequently rectified, and the shares transferred to the appropriate trusts. The Jains claim not to have read their brokerage statements and were thus initially unaware of the misdeposits.

¶6 In 2001, an InfoSpace shareholder, Thomas Dreiling, filed suit in United States District Court, naming the Jains as defendants for engaging in "short-swing" trading in violation of section 16(b) of The Securities Exchange Act of 1934.

¶7 Dreiling alleged that the Jains engaged in four purchases that subjected them to liability for short-swing

trades. He contended that the escrow set up under the indemnity agreement constituted an unlawful transfer of shares from one of the trusts to Jain, triggering liability for short-swing trades. The other alleged purchases occurred at the time the InfoSpace stock split and shares intended for the trusts were deposited instead in the Jains' personal brokerage account. It was undisputed that the Jains sold InfoSpace shares within six months of the alleged purchases.

¶8 The district court ruled that the transferred shares were purchases for purposes of determining whether short-swing trades had occurred and granted Dreiling summary judgment. The court entered judgment against the Jains, ordering that the putative profits realized from the sales be disgorged to InfoSpace as required under section 16(b). The court also ordered payment of prejudgment interest.

¶9 The Jains appealed. Pending the appeal, they obtained a supersedeas bond, and the district court stayed execution of the judgment. The SEC interceded on the Jains' behalf and filed an amicus brief in support of their appeal. Before the appeal was heard, however, the Jains entered into a global settlement with Dreiling, InfoSpace, and various insurers.

¶10 The Jains then filed suit against the respondents in superior court, alleging, inter alia, negligence, breach of fiduciary duty, legal malpractice, and equitable indemnity. They sought reimbursement by the respondents for the costs and damages resulting from the judgment and settlement in the 16(b) suit, including attorney fees and litigation costs, as well as the loss of appreciation and other opportunity costs to their investment portfolios alleged to have resulted from obtaining the supersedeas bond. The Jains alleged various irregularities regarding the escrow account, the footnote in the SEC prospectus regarding the escrow account, the misdeposit of split stock shares into their personal account rather than the trust account, and numerous claims of legal malpractice by Perkins in its representation of the Jains in the federal 16(b) suit.

¶11 The court dismissed the Jains' complaints. The Jains now appeal.

## II

¶12 A trial court's ruling to dismiss a claim under CR 12(b)(6) is reviewed de novo.[2] Dismissal is warranted only if the court concludes, beyond a reasonable doubt, the plaintiff cannot prove any set of facts that would justify recovery.[3] The court presumes all facts alleged in the plaintiff's complaint are true.[4] The court is not, however, required to accept the complaint's legal conclusions as true.[5] A motion to dismiss is granted sparingly and with care and, as a practical matter, only where it appears on the face of the complaint that there is some insuperable bar to relief.[6] Here, section 16(b) and the Washington State "ABC rule" governing attorney fees bar the Jains' claims.

### De Facto Indemnification

¶13 Section 16(b) of the Securities Exchange Act is designed to deter transactions which have a high potential for fraud.[7] The section prohibits corporate insiders from buying and selling their company's stock within a six-month period.[8] Profits resulting from purchase-and-sale or sale-and-repurchase transactions within a period of less than six months are commonly known as "short-swing" transactions.[9]

---

[2] *Tenore v. AT&T Wireless Servs.*, 136 Wn.2d 322, 329-30, 962 P.2d 104 (1998).

[3] *Tenore*, 136 Wn.2d at 330.

[4] *Tenore*, 136 Wn.2d at 330.

[5] *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 120, 744 P.2d 1032, 750 P.2d 254 (1987).

[6] *Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007) (quoting *Hoffer v. State*, 110 Wn.2d 415, 420, 755 P.2d 781 (1988)).

[7] *First Golden Bancorporation v. Weiszmann*, 942 F.2d 726, 729 (10th Cir. 1991).

[8] 15 U.S.C. § 78p(b).

[9] *Roth v. Jennings*, 489 F.3d 499, 507 (2d Cir. 2007).

¶14 Congress recognized that insiders may have access to information about their corporations not available to the rest of the investing public.[10] By trading on this information, insiders could reap profits at the expense of less well informed investors.[11] Congress sought to curb insider trading by enacting a strict rule requiring any insider who violates section 16(b) to return to the company any profits they might gain.[12]

¶15 Where the possibility of abuse is so intolerably great, Congress deemed such a strict rule to be the only effective method of curbing the evils of insider trading and considered the rule's arbitrary and sweeping coverage necessary to insure the optimum prophylactic effect.[13]

■ ¶16 Unlike other provisions of the securities laws, section 16(b) is a strict liability provision where questions of intent or scienter are irrelevant.[14] This approach maximizes the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. The thrust of the statutory scheme thus places responsibility for meticulous observance of the provision squarely on the shoulders of the insider alone.[15] The insider is deemed capable of structuring his or her dealings to avoid any possibility of taint and, therefore, must bear the risks of any inadvertent miscalculation.[16]

¶17 Congress recognized from the outset that section 16(b) might impose liability on some innocent insiders whose

---

[10] *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 243, 96 S. Ct. 508, 46 L. Ed. 2d 464 (1976).

[11] *Foremost-McKesson*, 423 U.S. at 243.

[12] 15 U.S.C. § 78p(b).

[13] *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422, 92 S. Ct. 596, 30 L. Ed. 2d 575 (1972) (quoting *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir. 1970)).

[14] *Deephaven Capital Mgmt., LLC v. Schnell*, No. 06-844, 2007 U.S. Dist. LEXIS 1504, at *8 (D. Minn. Jan. 5. 2007).

[15] *Bershad*, 428 F.2d at 696.

[16] *Bershad*, 428 F.2d at 696.

short-swing transactions were wholly inadvertent.[17] Nevertheless, while the results may be harsh in individual cases, this arbitrary rule is necessary to attain the goal set forth in the statute.[18]

■ ¶18 It is well settled that an insider found to have violated section 16(b) may not seek indemnification for the ensuing liability.[19] This is to prevent an insider from effectively waiving the requirement that short-swing profits be returned, thus frustrating the policy behind section 16(b).[20]

¶19 In addition to barring direct indemnity, the courts also bar de facto indemnification.[21] To the extent that a plaintiff's state actions are found to be de facto claims for indemnification, they are preempted.[22] Claims integrally related to securities claims that have been settled are likewise preempted by federal securities laws.[23]

¶20 The Jains argue that their state law claims are legally distinguishable, fault-based claims approved by federal securities law, and are not merely de facto indemnity claims. They further argue that barring their state tort claims will serve to shield brokers and law firms from negligence and breach of duty claims.

¶21 The respondents insist that section 16(b) serves as a categorical bar on recovery and that the Jains' state tort actions can be viewed only as de facto indemnity claims.

¶22 Those courts which have dealt with indemnification under section 16(b) have reached a harsh and restrictive

---

[17] PETER J. ROMEO & ALAN L. DYE, SECTION 16 DESKBOOK 365 (2007).

[18] *Petteys v. Butler*, 367 F.2d 528, 532 (8th Cir. 1966).

[19] *See First Golden*, 942 F.2d at 728-29; *Bunker Ramo-Eltra Corp. v. Fairchild Indus., Inc.*, 639 F. Supp. 409, 418-19 (D. Md. 1986).

[20] *Schaffer ex rel. Lasersight, Inc. v. CC Invs., LDC*, 286 F. Supp. 2d 279, 283 (S.D.N.Y. 2003); *Bunker Ramo-Eltra Corp.*, 639 F. Supp. at 419.

[21] *Lucas v. Hackett Assocs., Inc.*, 18 F. Supp. 2d 531, 536 (E.D. Pa. 1998); *Baker, Watts & Co. v. Miles & Stockbridge*, 876 F.2d 1101, 1108 (4th Cir. 1989).

[22] *Baker, Watts*, 876 F.2d at 1108.

[23] *In re Cendant Corp. Sec. Litig.*, 139 F. Supp. 2d 585, 596 (D.N.J. 2001).

conclusion. Given that section 16(b) is a strict liability provision, any claim which is colorable as indemnity or de facto indemnity is barred.

¶23 For guidance on distinguishing de facto indemnification from separate tort claims, we turn to *First Golden Bancorporation v. Weiszmann*.[24]

¶24 First Golden Bancorporation sued Weiszmann for recovery of profits he made through short-swing trades in violation of section 16(b).[25] Weiszmann, in turn, brought third party claims against Morgan Stanley, which had acted as Weiszmann's financial advisor during the course of the section 16(b) violation, and against the purchaser of the stock.[26] He claimed indemnity, as well as a number of state tort claims including outrageous conduct, breach of contract, fraud, and negligent representation.[27] He sought indemnification for any liability to First Golden, reimbursement of attorney fees and costs, and recovery of commissions and profit realized by Morgan Stanley from the sale of the stock.[28]

¶25 The court upheld the dismissal of Weiszmann's indemnity claim, noting that such indemnity contravened the public policy enunciated by the federal securities laws.[29] While Congress felt that the imposition of strict liability was the most effective way to deter fraud, the imposition of strict liability did not minimize the purpose of preventing fraudulent trading based upon insider information or manipulation.[30]

¶26 The court then proceeded to analyze Weiszmann's remaining claims to determine whether they constituted de

---

[24] 942 F.2d 726 (10th Cir. 1991).

[25] *First Golden*, 942 F.2d at 728.

[26] *First Golden*, 942 F.2d at 728.

[27] *First Golden*, 942 F.2d at 728.

[28] *First Golden*, 942 F.2d at 728.

[29] *First Golden*, 942 F.2d at 728.

[30] *First Golden*, 942 F.2d at 729.

facto indemnification, stating that to the extent that they were disguised indemnity claims, they could not stand.[31] The court drew a distinction between profits which would rightly be disgorged to First Golden and those which arose separately.[32] Thus, for instance, Weiszmann might properly seek the return of Morgan Stanley's commissions and profits from the sale of First Golden stock.

> We note that the $112,260 sum at issue in these remaining claims is not part of First Golden's claims against Weiszmann because the profit made by the third-party defendants is clearly not profit inuring to Weiszmann through his sale of First Golden stock. Therefore, because First Golden never had a right to this $112,260, Weiszmann may be able to characterize this portion of his third-party claims as non-indemnity claims.[33]

¶27 The court held that the profits and commissions the third parties earned off the sale of Weiszmann's stock were clearly not recoverable by First Golden in its original section 16(b) action and to that extent Weiszmann's claims may not have been de facto indemnity claims.[34]

¶28 The court then remanded to the district court to review the claims and determine whether and to what extent they sought relief other than indemnification.[35] The court instructed the district court that to the extent any of the claims were indemnification claims for liability that Weiszmann incurred under section 16(b), they should be dismissed with prejudice.[36]

¶29 The *First Golden* court's analysis is reinforced by the recent holding in *Deephaven Capital Management, LLC v.*

---

[31] *First Golden*, 942 F.2d at 731-32.

[32] *First Golden*, 942 F.2d at 731.

[33] *First Golden*, 942 F.2d at 731.

[34] *First Golden*, 942 F.2d at 732.

[35] *First Golden*, 942 F.2d at 732.

[36] *First Golden*, 942 F.2d at 732.

*Schnell.*[37] Deephaven sued Schnell, one of its portfolio managers, alleging that Schnell's trading activities on behalf of funds he managed caused the funds to violate section 16(b).[38] The court held that any indemnity for section 16(b) violations would undermine the deterrent purpose of the section by allowing a wrongdoer to recoup its disgorged profits. It concluded that Deephaven was not entitled to seek reimbursement for short-swing profits it disgorged, even when the losses resulted from allegedly rogue trades by one of its own managers.[39]

¶30 The *First Golden* court remarked that strict liability did not minimize the purpose behind the securities statute.[40] If anything, that understates the case. Section 16(b) is draconian. By imposing strict liability, Congress has given notice to insiders that they should exercise great vigilance in the disposition of their shares. The necessity of protecting investors is no less compelling today than it was when Congress wrote the securities act. To allow indemnification or de facto indemnification by an insider would run counter to the public policy behind section 16(b).

¶31 The *First Golden* court's analysis of de facto indemnity is persuasive. Under its holding, to whatever extent funds recovered under a state tort claim are comparable to the funds disgorged under section 16(b), they must be barred as de facto indemnification.

██ ¶32 The Jains listed equitable indemnity as one of their causes of action. They seek reimbursement by the respondents for the costs and damages resulting from the judgment and settlement in the 16(b) suit, the attorney fees they expended in defending the section 16(b) action, and the investment losses they claim to have suffered in connection

---

[37] No. 06-844, 2007 U.S. Dist. LEXIS 1504 (D. Minn. Jan. 5, 2007).

[38] *Deephaven,* 2007 U.S. Dist. LEXIS 1504, at *1-3.

[39] *Deephaven,* 2007 U.S. Dist. LEXIS 1504, at *8-10; ROMEO & DYE, *supra,* at 371.

[40] *First Golden,* 942 F.2d at 729.

with the bonding requirements for their appeal of the section 16(b) action.

¶33 The Jains' request for equitable indemnification reinforces the respondents' contention that the Jains' claims are merely requests for de facto indemnification in a different guise.

¶34 The Jains argue that dismissal of their state tort claims might shield securities professionals from the consequences of their negligence and malpractice. Certainly the State has a strong interest in enforcing its tort laws. Brokers, financial advisors, and lawyers should be answerable in state court for harms they have caused their clients. But, to the extent that state claims constitute any form of indemnification, the strict liability provisions of section 16(b) would be fatally undermined were insiders able to pursue those claims, however named, against third parties. To permit such claims to proceed would essentially make the insiders whole again, as if they had not been obliged to disgorge their profits in the first place.

¶35 The Supreme Court made clear that section 16(b)'s arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect.[41] Only by exercising uncompromising rigidity can the courts maintain the prophylactic standard of behavior imposed by section 16(b).[42]

¶36 The Jains' argument that the State has an interest in allowing their claims to proceed under separate and distinct legal theories must ultimately give way to the bright line, strict liability provisions of section 16(b). We hold that because they seek recovery of the profits they were required to disgorge to InfoSpace, the Jains' claims constitute de facto indemnification and present an insuperable bar to relief. To the extent the Jains raise other claims,

---

[41] *Reliance*, 404 U.S. at 422 (quoting *Bershad*, 428 F.2d at 696).

[42] *Volk v. Zlotoff*, 285 F. Supp. 650, 656 (S.D.N.Y. 1968) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928)).

they are governed by state law. Because we hold the Jains' claims are barred, we do not address Perkins's cross-appeal.

*The ABC Rule*

¶37 In addition to being barred as de facto indemnity, the Jains' claims also fail to satisfy the requirements of Washington's ABC rule.

■■ ¶38 The general rule in Washington is that attorney fees are not awarded unless permitted by contract, by statute, or in specific equitable circumstances.[43] One such equitable exception is the so-called "ABC rule," which allows an award of attorney fees as consequential damages.[44]

¶39 However, we have consistently held that a party may not recover attorney fees or costs of litigation under the theory of equitable indemnity if, in addition to the wrongful act or omission of A, there are other reasons why B became involved in litigation with C.[45] "[T]he critical inquiry under the causation element of equitable indemnity is whether, apart from A's actions, B's own conduct caused it to be 'exposed' or 'involved' in litigation with C."[46]

¶40 The Jains were not blameless in the transactions giving rise to their liability. The district court laid out how the Jains' own actions caused them to run afoul of section 16(b):

> The Jains signed papers allowing transfer of funds from the [trusts]. The Jains caused deposits of trust stock into their personal brokerage accounts by forwarding stock certificates to their personal broker. Mr. Jain promised to place shares of the . . . trust into escrow to fulfill a personal obligation. The fact that the Jains failed to read their brokerage statements, simply signed legal documents without knowing what they were, and

---

[43] *Morgan v. Roller*, 58 Wn. App. 728, 730, 794 P.2d 1313 (1990).

[44] *Manning v. Loidhamer*, 13 Wn. App. 766, 769, 538 P.2d 136, *review denied*, 86 Wn.2d 1001 (1975).

[45] *Tradewell Group, Inc. v. Mavis*, 71 Wn. App. 120, 126, 857 P.2d 1053 (1993).

[46] *Tradewell Group*, 71 Wn. App. at 129.

mistakenly sent certificates to their personal broker does not make their actions involuntary. . . . [T]he Jains participated in the transfers and retained more than a degree of control over the transactions. Without the participation of the Jains, the transfers would not have happened.[47]

¶41 We hold that the Jains' own conduct caused them to be involved in the litigation and, therefore, under the ABC rule they may not recover fees or litigation costs.

¶42 The superior court's grant of the respondents' motions to dismiss is affirmed.

COLEMAN, J. PRO TEM., concurs.

¶43 APPELWICK, C.J. (concurring) — I concur in the reasoning and result reached by the majority. The majority opinion tacitly acknowledges the Jains' claims for attorney fees were not extinguished by section 16(b) of The Securities Exchange Act of 1934.[48]

¶44 I would however explicitly hold that section 16(b) is not a bar to malpractice claims under state tort law. Rather the act limits the relief available under those claims by precluding indemnification for profits disgorged for violation of the act. The unavailability of indemnity will be dispositive of claims in some cases, but not necessarily all.

Reconsideration denied February 12, 2008.

Review denied at 164 Wn.2d 1022 (2008).

---

[47] *Dreiling v. Kellett*, 281 F. Supp. 2d 1215, 1223 (W.D. Wash. 2003).

[48] Codified at 15 U.S.C. § 78p(b).